Ronald BARON, et al.

v.

STRAWBRIDGE & CLOTHIER, et al.

Civ. A. No. 86–2870.

United States District Court,
E.D. Pennsylvania.

July 21, 1986.

Lee A. Rosengard, Fred C. Aldridge, Jr., John O'Dea, Philadelphia, Pa., for plaintiffs.

Gregory M. Harvey, Thomas G. Wilkinson, Jr., Morgan Lewis & Bockius; William T. Hangley, Hangley Connolly Epstein Chicco Foxman & Ewing, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

JAMES McGIRR KELLY, District Judge.

### INTRODUCTION

This is an individual and derivative action brought by plaintiff Ronald Baron and two companies which he controls, Baron Capital, Inc. ("BCI") and Berry Acquisition Co. ("Berry")[1] in connection with Baron's attempt to acquire control of defendant Strawbridge & Clothier ("the Company"), a publicly held corporation. The defendants are the company and all twelve members of its Board of Directors. The suit seeks, *inter alia,* to enjoin certain actions to be taken at the annual meeting of the Company's shareholders and to recover damages which are claimed to exceed tens of millions of dollars. The plaintiffs' claims are brought under Sections 10(b), 13(d), 14(a) and 14(e) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78m(d), 78n(a) and 78n(e) and the rules and regulations promulgated thereunder by the Securities and Exchange Commission; under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.;* and under Pennsylvania statutory and common law.

The plaintiffs move for preliminary injunctive relief. They request that the court intervene and enjoin the defendants

---

**1.** Berry does not own Strawbridge & Clothier stock, and thus, has brought only individual claims against the plaintiffs.

from implementing a plan to reclassify the common stock of the company ("the plan"). The plan is to be presented for a shareholder vote at a meeting scheduled for July 23, 1986. The plaintiffs allege that the defendant directors are all "insiders" devoted to the perpetuation of the Strawbridge & Clothier families' control over the affairs of the Company, regardless of the consequences to the shareholders, in violation of their duties of loyalty and of care. According to the plaintiffs, this case presents the classic situation of an entrenched management abusing its control position to perpetuate itself in office. The plaintiffs allege the reclassification plan would permanently lock up control for management of the company and insulate the controlling group from any challenge.

The defendants vigorously contest the plaintiffs' characterization of the Company's management as entrenched or abusive. The defendants also move to dismiss the derivative claims in this action on the basis that Baron cannot fairly and adequately represent the shareholders, as required by Fed.R.Civ.P. 23.1, because his interests are antagonistic to the interest of his fellow Strawbridge & Clothier shareholders.

Following an expedited period of discovery and a four day hearing, and for the reasons set forth in the following memorandum, the plaintiffs' derivative claims will be dismissed for want of fair and adequate representation and the plaintiffs' request for preliminary injunctive relief will be denied for want of a showing of irreparable harm or probability of success on the merits.

### FACTUAL BACKGROUND AND FINDINGS

Defendant Strawbridge & Clothier is a corporation organized under the laws of Pennsylvania with its principal place of business at Philadelphia, Pennsylvania. Although Strawbridge & Clothier's shares have been publicly held since the 1930's, approximately 40% of its stock continues to be owned directly or beneficially by descendants of the two founders, Justus C. Strawbridge and Isaac H. Clothier. Five members of the third and fourth generations of the Strawbridge family are engaged full-time in the management of the Company, and other Strawbridge descendants, as well as one Clothier descendant, serve as directors. The Company's Board of Directors ("board") is composed of twelve individuals, (the individual defendants in this action) eleven of whom are the company's current or former senior officers or their relatives.

In the last decade, many retail chains have been acquired by national or international chains or conglomerates. Strawbridge & Clothier has avoided this trend. The Company's management ("management") and its board view this independence to be a predominant factor in the company's success. Each manager and director who testified in this matter emphasized that in his or her view, the company's independence is its most highly prized asset. Two reasons were repeatedly articulated for supporting this conclusion: that the influence of continuous, local family management (1) fosters a unique relationship, based on loyalty and dedication, between the company's employees and managers, and (2) makes it possible for the Company to plow earnings back into the business and opt for greater long term growth instead of smaller, more immediate short-term profits. An expert witness from the retail business, who is not associated with the Company, also testified to these benefits of local, independent management.

Plaintiff Ronald Baron, a resident and citizen of New York and plaintiff BCI, a New York corporation, have both owned common stock of Strawbridge & Clothier continuously for the past four years. Plaintiff Berry, a corporation organized under Delaware laws with its principal place of business at New York, was organized in 1986 for the purpose of making a tender offer for Strawbridge & Clothier's shares.

In 1984, management perceived that Ronald Baron was mounting an attempt either to take over the Company or to "put

the company in play" and enable his shares to be sold at a premium. Baron's early steps included demands that the Company sell off or mortgage important assets, that it consider selling out to a third party, and that Baron be named as a director. Baron also publicly announced that he considered the Company "ripe for a takeover".

Management proposed to its shareholders that they approve various measures designed to discourage a hostile takeover. These measures (the "1984 proposals") included the elimination of cumulative voting; an increase in the percentage of shares necessary to call a special meeting of shareholders; the requirement of two-thirds shareholder approval of actions not proposed by a majority of the board; and a requirement that candidates for election to the board be nominated at least 45 days prior to a meeting of shareholders. The "anti-takeover" purpose of these proposals was disclosed in the 1984 proxy materials. Management had been planning these proposals for some time, but accelerated their presentation in direct response to the threat presented by Baron's activities; this, too, was fully disclosed in the proxy materials. All of the antitakeover proposals were approved by the shareholders at a special meeting held on April 10, 1984.

Thereafter, Baron made other overtures, culminating in Berry's April 21, 1986 tender offer (the "tender offer"). The tender offer has a two-tiered structure: it proposes to buy two-thirds of the Company's outstanding common stock at a price of $60 per share and total purchase price of $276.25 million; if successful, the purchasers plan to then buy out the remaining shareholders for cash, or for debt securities of unspecified terms.

Management reviewed the tender offer, and solicited the advice of two firms of independent investment bankers, Drexel Burnham Lambert Incorporated ("Drexel") and Kidder Peabody & Co., Incorporated ("Kidder Peabody"). Both firms opined that the tender offer price was financially inadequate for the Company's shareholders. For that reason and others, including expert advice that the two-tiered offer, by its structure, constitutes a coercive choice for shareholders, the Company decided to oppose the offer, and so advised the shareholders. Also in response to the tender offer, holders of 47.9% of the Company's common stock agreed among themselves not to sell their stock through October 31, 1986 ("the agreement"). An appropriate filing of this agreement was made with the Securities and Exchange Commission on Schedule 13D.

In the Company's current proxy materials, distributed May 12, 1986 for a scheduled June 11, 1986 annual meeting of shareholders, management proposes a reclassification of stock which is, like the 1984 proposals, designed to discourage hostile takeovers. The number of shares would be doubled and reclassified into two series: Series A with one vote per stock, and Series B with ten votes per stock. The one vote stock would be entitled to dividends at least 10% higher than the ten vote stock. There would be no restriction on the transfer of the one vote stock. The ten vote stock may not be transferred except to a "permitted transferee": (a) any lineal descendant of a great grandparent of the holder of the ten vote stock, including adopted children, and any spouse of such lineal descendent; (b) a trust principally for the benefit of the holder's lineal descendants; (c) the holder's spouse; (d) the estate of such holder; (e) a co-owner, and (f) in the case of shareholder corporations or partnerships, their beneficial owners at the effective date of the reclassification. The ten vote stock is convertible into one vote stock; the one vote stock may not be converted into ten vote stock. The ten vote stock will not constitute over-the-counter margin stock, and thus, such shares will not be assigned any value in a margin account maintained with a broker-dealer. The proxy materials plainly disclose that the purpose of the reclassification plan is "to further strengthen our defenses against hostile takeover threats from outside sources". Testimony revealed similar plans have been proposed and put into effect in other corporations.

This law suit was brought on May 14, 1986, and was accompanied by a motion for preliminary injunctive relief. The plaintiffs seek to enjoin the plan and seek redress for a policy of management entrenchment. At the court's suggestion, the annual meeting was adjourned until July 23, 1986, in order to allow for orderly, albeit expedited, discovery prior to the hearing.

The plaintiffs' complaint lists numerous instances where management's decisions have allegedly been based on a singular policy of entrenchment. Among these are: allegations of misappropriation of Company funds to make selective buy backs from the FMR Corporation and from the Robert E. Strawbridge, III group ("RES 3") and to award lifetime employment contracts to the executive officers; allegations that unqualified persons were appointed to the board; allegations that anti-takeover devices were proposed to entrench the director's position of control; allegations that proxies were illegally solicited in advance of the distribution of proxy materials and that the materials included misstatements and omissions; and allegations that the directors have proposed the reclassification plan in order to solidify their entrenched position, despite the fact it will harm the stockholders, and have utilized unlawful tactics to repel the Berry tender offer.

Expert testimony presented by the defendants revealed that management had proper purposes in effecting the FMR and RES 3 transactions, that the price paid by the Company for the blocks represented a fair value for the stock, and that the company acted with due deliberation and with the advice of outside investment analysts. Testimony also revealed that shareholders' dividends and stock values did not decline following either of these transactions, but rather, rose.

Testimony revealed that the Company's directors have been nominated on the basis of their respective educational backgrounds, their employment histories, their business and financial acumen and their various perspectives on the community which the Company serves, as well as their positions within the various Strawbridge families. No showing was made by the plaintiffs that an incompetent director has been nominated by the board.

Testimony explained that, prior to the distribution of proxy materials, the members of the Strawbridge families were canvassed regarding their intended action on the reclassification vote precisely because the staff of the Securities and Exchange Commission requested management do so, in its comment letter of April 8, 1986 regarding the Company's proposed proxy materials.

Testimony and exhibits showed that the proxy materials plainly and openly disclose the probable and possible effects of the reclassification in the summary, in the letter to the shareholders and in the proxy itself. Misstatements or omissions in the materials were not revealed to the court at the hearing or in the pleadings.

The evidence demonstrates that the instant reclassification plan is similar to plans adopted by other publicly-owned corporations, and that the trading patterns of the stocks of a large number of corporations studied by Kidder Peabody show that Class A and Class B shares are valued similarly in the market, especially when there is a 10% dividend differential, as in the instant plan. Expert testimony also clarified that while the reclassification plan's high vote stock is not marginable (as required by the Federal Reserve Board Rules), the stock may be pledged as collateral to borrow even greater amounts from a bank than may be obtained from a broker on a margin account.

The Company has been at the forefront of successful community development efforts. In the last five years, the Company has shown an increase in sales of 61% and an increase in per share earnings of 153%. Testimony has revealed that these successes may at least be partially attributed to the influence of the Strawbridge family in insuring continuous, independent, local management.

The plaintiff Ronald Baron is plaintiff Berry Acquisition Co.'s sole shareholder

and director, and is also its president, chief executive officer and secretary/treasurer.

## DEFENDANTS' MOTION TO DISMISS DERIVATIVE CLAIMS

Fed.R.Civ.P. 23.1 makes explicit the requirement that in derivative actions, the plaintiffs must fairly and adequately represent the interests of similarly situated shareholders. To meet this requirement, the plaintiffs must not have interests antagonistic to those of their fellow shareholders. *Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir.) *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). The factors to be considered in deciding whether the requirement is met are set forth in *Davis v. Comed, Inc.*, 619 F.2d 588, 593–94 (6th Cir.1980), *quoted with approval in Vanderbilt v. GEO–Energy Ltd.*, 725 F.2d 204, 207 (3d Cir.1983):

> economic antagonisms between representative and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants; and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent.

Perhaps the most important element to be considered is whether the plaintiffs' interests are antagonistic to those he is seeking to represent. *See* 7A Wright & Miller, *Federal Practice and Procedure* § 1833 at 393. The burden is on the defendants to obtain a finding of inadequate representation. The defendants have satisfied that burden in this matter.

Baron is not merely an unhappy shareholder; rather, he is also a tender offeror who is seeking to gain control of the Company. Baron hopes to acquire control at the lowest possible price per share; the other shareholders, if required to sell their shares, would want the highest possible price per share. These interests are manifestly antagonistic.

The tender offer by plaintiff Berry is not irrelevant to the derivative claims brought by plaintiffs Baron and Baron Capital, Inc., and should be considered by the court in evaluating the adequacy of the representation. A court "may take into account outside entanglements that render it likely that the representatives may disregard the interests of the other class members", *Davis*, 619 F.2d at 593, *quoting Blum v. Morgan Guaranty Trust Co. of New York*, 539 F.2d 1388, 1390 (5th Cir.1976).

The tender offer is not hypothetical, potential or remote so as to render it irrelevant to the court's consideration. Rather, it is on-going. Thus, *Tyco Laboratories, Inc. v. Kimball*, 444 F.Supp. 292 (E.D.Pa. 1977), which did not involve an imminent takeover threat, is distinguished from the instant case. Furthermore, the underlying complaint's numerous allegations include claims that the company has illegally and improperly responded to the Berry tender offer. The plaintiffs' argument that the alleged antagonism does not go the subject matter of the suit is not persuasive. It is the court's observation, and its conclusion, that the plaintiffs' struggle for control of Strawbridge & Clothier is at the very root of the plaintiffs' action.

In finding that economic antagonisms exist between the plaintiffs and the other shareholders, the court is not suggesting that interests automatically diverge in all cases where a derivative plaintiff is a potential purchaser and other shareholders are potential sellers. For example, where the purchaser agrees to share the future benefits of liquidation with any shareholders who may have tendered shares, the divergence of interest is minimized. *See e.g., Shamrock Associates v. Horizon Corp.*, 632 F.Supp. 566 (S.D.N.Y.1986). However, in the Baron/Berry tender offer, there is no such community of interests. Tendering shareholders have no right to participate in any proceeds from sale of the company's assets or any other future bene-

fits, even though Baron himself has admitted that the stock is worth more than the price offered per share.

Derivative causes of action have been stated, and the plaintiffs do share a common interest with the other shareholders in preserving the value of their shares and preventing directors from abusing powers. However, the plaintiffs are not the proper parties to pursue the claims. Where serious and substantial antagonisms exist between the representative plaintiff and the other shareholders, the mere articulation of a common interest is not dispositive. The economic antagonisms between the plaintiffs and the other shareholders reveal a "classic conflict"; thus, adequate representation is lacking. *See: Hall v. Aliber,* 614 F.Supp. 473 (E.D.Mich.1985); *William Penn Management v. Provident Fund,* 68 F.R.D. 456 (E.D.Pa.1975).

Furthermore, in addition to economic antagonism, three other factors support the court's finding of inadequate representation. First, it is clear that the plaintiffs' personal interest in blocking the reclassification plan, and thereby, in Baron's own words, bettering his tender offer's chances of success, is far greater than his interest in the derivative action itself. Second, no other shareholder has joined this action, nor has other shareholder support for the plaintiff been evidenced. Third, while difficult to measure or convey, the court has observed some amount of vindictiveness between the parties.

The plaintiffs are not the only shareholders who could bring the derivative claims of this suit against the company and its board. In view of the Rule 23.1's explicit requirement that derivative plaintiffs fairly and adequately represent the interests of all shareholders, and given the antagonistic interests between the shareholders, the derivative claims will be dismissed.

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The standard in this circuit for preliminary injunctive relief requires a showing by a plaintiff that "(1) irreparable injury will be caused if relief is not granted to maintain the status quo, and (2) it has reasonable probability of eventual success on the merits. Additionally, the court must weigh the possibility of harm to the non-moving party, and where relevant, the possibility of harm to the public." *E.H.I. of Florida, Inc. v. Insurance Company of North America,* 499 F.Supp. 1053, 1058 (E.D.Pa. 1980) (citation omitted), *aff'd,* 652 F.2d 310 (3d Cir.1981). In corporate control contests, injunctive relief may be appropriate where it may otherwise be "virtually impossible for a court to 'unscramble the eggs'." *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir.1973) (citation omitted). However, it is well-settled that the power to issue a preliminary injunction should be sparingly exercised. *United States v. Spectro Foods Corporation,* 544 F.2d 1175, 1181 (3d Cir.1976).

The plaintiffs allege they will be irreparably harmed unless the court prevents the defendants from presenting the reclassification plan to the shareholders for a vote. According to the plaintiffs, in proposing this plan the directors have acted as an "interested board" whose primary motive is to retain control, in violation of its fiduciary obligations to shareholders. The plaintiffs attempted to satisfy their burden of persuading the court by (1) providing examples of company policies and actions which reveal a singular and abusive purpose of maintaining control, (2) revealing the reclassification plan to be without a legitimate corporate purpose; and (3) showing the plan itself to be unfair to non-controlling shareholders. In fact, the plaintiff has not made a successful showing in any of these areas.

1. *The board has not been shown to have acted in fraud, bad faith or self-interest*

■ As set forth in the factual findings, testimony at the four day hearing disposed of the examples which were proposed by plaintiffs to be illustrative of a singular

policy of management entrenchment at the expense of shareholder interests. The buy-backs of the FMR and RES 3 stock blocks did not constitute a misappropriation of funds, and the company and its shareholders were not harmed by these actions. The nominations of certain descendants of the company's founders to be directors of the company was based on proper evaluations of their various qualifications and perspectives. No illegal solicitation of committed proxies occurred in advance of the distribution of the May 12, 1986 proxy materials. The proxy materials do not contain omissions or misstatements. They clearly set forth the Company's purposes in proposing the reclassification plan, as well as the possible effects of the plan on stock and vote distribution among the various shareholders. In short, none of the examples set forth by the plaintiffs reveal the directors to have taken advantage of their fiduciary relationship by engaging in self-dealing; the duties of care and of loyalty have been met in these instances.

2. *The reclassification plan, and other anti-takeover actions, serve legitimate corporate purposes*

■ The company was faced with a generalized threat, dating to 1984, to its long-standing corporate policies. Testimony has shown that the plaintiff Ronald Baron disagrees fundamentally with nearly every major management decision the Company makes. The Company was also faced with a particularized threat to its corporate policies in the form of Berry's two-tiered tender offer. The Company and its directors have dealt with these threats properly, without breaching fiduciary duties to shareholders. The board acted with due deliberation and care, and did not act hastily. It was proper for the company to consider the effects the Berry tender offer would have, if successful, on the Company's employees, customers and community. Pa.Stat.Ann. tit. 15 § 1408 (Purdon 1967 + Supp.). The Company concluded these effects would be detrimental to its success. The company solicited experts to provide a financial evaluation of the offer. The ex-

perts concluded the offer was financially inadequate. Under the law of Pennsylvania, as in other jurisdictions, *Enterra Corp. v. SGS Associates*, 600 F.Supp. 678, 686 (E.D.Pa.1985), the fiduciary duty of corporate directors "to act in the best interests of the corporation's shareholders ... requires the directors to attempt to block takeovers that would [in their judgment] be harmful to the target company," and "directors are obliged to oppose tender offers deemed to be 'detrimental to the well-being of the corporation even if that [opposition] is at the expense of the short-term interests of the individual shareholders.' "

Defensive proposals and alternatives were considered over many months. The evidence shows that the Board of Directors considered and rejected the so-called "poison pill" rights plan as unfair and also determined not to pursue a "time phased" voting plan, in part because the shareholders would have no choice of the sort offered by the instant reclassification plan. Expert, independent advice was also solicited to provide an analysis of various plans, as well as an analysis of the effect of the proposed reclassification plan on the price of stock. In short, the Company weighed the interests of all shareholders in responding to the takeover threats posed by the plaintiffs, and the Company's responses, including the proposed reclassification plan, served legitimate corporate purposes.

The evidence showed that the directors were conscious of their duty to consider each future takeover effort from outsiders, including tender offers, on the merits, and the plaintiffs' reliance on isolated portions of the testimony of the two most recently elected directors did not establish the contrary proposition.

3. *The reclassification plan itself is legal and presents a fair choice to shareholders*

■ The plaintiffs have stipulated that Pennsylvania corporation law gives the Company the power to adopt the reclassification plan. However, the plaintiffs assert

that the exercise of this power would be so unfair as to be invalid. After hearing testimony and reviewing Pennsylvania law, I conclude this assertion is incorrect.

The plan treats all shareholders alike and is not inequitable to any shareholder or shareholder group. First, all shareholders have the opportunity to vote for or against the plan at the meeting of July 23. Second, all shareholders can elect either the one vote or ten vote series: the ten vote series is not restricted to insiders. The court is cognizant of the fact that the election between the two types of stocks involves difficult choices in which issues such as marginability, differential voting rights and differential dividends must be balanced against each other. However, the fact that the plan necessitates a difficult choice does not render it inequitable.

There is no basis in Pennsylvania law, historic or otherwise, for a policy of one vote per share in common stock. Pa.Stat. Ann. tit. 15 § 1601 (Purdon 1967 + Supp.). Under Pennsylvania law, restrictions on the transferability of shares are valid unless "manifestly unreasonable," Business Corpo[.]a[. Law § 613.1 C(4), showing a legislative determination that such restrictions should be permitted unless they pass beyond "the outer limit of permissiveness." No evidence has been presented which would indicate that the value of shareholders' stock will be harmed by implementation of the plan. Furthermore, each shareholder is presented with several options should he or she find elements of the plan unattractive. For example, if the restrictions on transferability of the ten vote stock are unappealing to a shareholder, he or she can vote against the plan, elect to take Series A shares, or elect to take Series B shares and convert later to Series A. If a shareholder disagrees with the expert analysis that the reclassification will not have an adverse impact on stock values, he may elect the shares he speculates will be more valuable.

If the plan had been structured so as to preclude the non-controlling shareholders from electing a particular series of stock, the court may have found the plan to be a violation of the directors' trust obligation. *See, e.g.: Kahn v. Schiff,* 105 F.Supp. 973 (S.D.Ohio 1952). However, that is not this case; since each shareholder has the same choice, it cannot be said that the plan discriminates against any group.

Should the plan be approved by the shareholders, it will be possible for the controlling shareholders to control a majority of the voting power while holding as little as 9.1% of the outstanding voting stock of the company. However, this possibility is explicitly set forth in the proxy materials themselves, and does not compel a finding that the plan is inequitable or unfair.

Lastly, the plaintiffs' allegation that the reclassification plan is really a Rule 13e–3 "going private" transaction is incorrect. The plan is specifically tailored to avoid the elements of a Rule 13e–3 transaction.

In conclusion, the plaintiff's request for preliminary injunctive relief must be denied. The plaintiffs' assertions have evidenced no showing of irreparable harm, nor a probability of success on the merits of the case. Nothing has indicated that the Company or its shareholders will be injured if the plan is voted on by the shareholders. Nothing has indicated that plaintiff Ronald Baron's interests as a shareholder will be injured if the vote is taken. Nothing has indicated that the Company's defensive, anti-takeover actions are the result of an "interested board" which has neglected its fiduciary duties or acted without legitimate corporate purposes. It is the primary obligation of directors to afford the corporation good management. Good management results largely from the managers' qualifications—their experience, skill, judgment and character—and not from extensive family relationships. *Kahn,* 105 F.Supp. at 976. But, as this matter has revealed, the two are not mutually exclusive.

An order follows.

### ORDER

AND NOW, this 21st day of July, 1986, for the reasons set forth in the foregoing

Memorandum, it is ORDERED that the motion brought pursuant to Fed.R.Civ.P. 23.1 by defendant Strawbridge & Clothier, and joined by the twelve individual defendants, to dismiss the derivative claims of plaintiffs Ronald Baron and Baron Capital, Inc. is GRANTED. All derivative claims contained in plaintiffs' complaint are hereby DISMISSED.

It is further ORDERED that the motion for preliminary injunctive relief brought by plaintiffs Ronald Baron, Baron Capital, Inc. and Berry Acquisition Co. is DENIED.[2]

---

**2.** "By stipulation approved by the Court, an Order was entered January 13, 1987, granting final judgment in defendants' favor on plaintiffs' claims for injunctive relief and dismissing all other claims. An appeal taken by plaintiffs from the foregoing Memorandum and Order entered July 21, 1986 to the United States Court of Appeals for the Third Circuit also was dismissed by agreement."