**Stephen BERG, et al., Appellants**

**v.**

**FIRST AMERICAN BANKSHARES, INC., et al.**

No. 85–5684.

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1986.

Decided July 22, 1986.

---

David J. Eiseman, New York City, for appellants.

Paul C. Warnke with whom J. Griffin Lesher, Robert P. Reznick and Kathy E. Manning, Washington, D.C., were on brief, for appellees.

Before WALD and EDWARDS, Circuit Judges, and KOZINSKI *, Circuit Judge, United States Court of Appeals for the Ninth Circuit.

Opinion for the Court filed by Circuit Judge WALD.

\* Sitting by designation pursuant to 28 U.S.C. § 291(a).

1. As part of the merger agreement Financial General changed its name to First American Bankshares, Inc.

WALD, Circuit Judge:

In August of 1982, Financial General Bankshares, Inc. (Financial General), a registered bank holding company, became a wholly-owned subsidiary of FGB Holding Corporation by means of a corporate merger.[1] Under the merger agreement, the two publicly traded classes of voting stock of Financial General were eliminated. The Class A common stock was cancelled at $28.00 a share while the regular common stock received $33.80 a share. Stephen Berg and 45 other owners of Class A common stock (hereinafter collectively referred to as Berg) brought an action for money damages alleging that certain defects in the proxy statement issued by Financial General in connection with the merger violated the Securities Exchange Act of 1934. The plaintiffs also sought damages for a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), as well as common-law fraud and breach of fiduciary duty in connection with the merger. After extensive pretrial discovery, the District Court granted the defendants' motion to dismiss or in the alternative for summary judgment on the ground that the alleged defects in the proxy statement were immaterial as a matter of law. The Court also dismissed the RICO claim. 590 F.Supp. 500. For the reasons stated herein, we affirm the District Court's dismissal of all claims against the defendants.

## I. EVENTS LEADING UP TO THE MERGER

Prior to becoming a wholly-owned subsidiary of FGB Holding Corporation, Financial General had two classes of voting stock, Class A common and regular common.[2] The Class A common stock had an $11 per share preference over the regular common in the event of liquidation and a 30 cent preference on cash dividends. The two classes of stock also differed in terms

2. Financial General also had a third class of stock, the Cumulative Preferred Stock, Series A, which carried no voting rights and remained outstanding after the merger.

of their voting power. Each share of Class A common stock carried one vote, while each share of regular common stock carried ten votes. There were, furthermore, over ten times as many outstanding shares of regular common as of Class A common stock, and thus the regular common stock represented approximately 99% of Financial General's total voting equity.

In December of 1977 and January of 1978, three Middle Eastern investors, Kamal Adham, Faisal Saud al Fulaij and Abdullah Darwaish ("the Investors"), each acquired a substantial number of shares of Financial General's regular common stock. In February of 1978, Financial General filed suit against the Investors, alleging that they had purchased their shares without making appropriate filings with the Securities and Exchange Commission (SEC) in violation of section 13(d) of the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78m(d). Financial General sought, among other things, to enjoin the Investors from making a tender offer for any additional shares of the company. A month later, on March 17, 1978, the SEC also instituted a lawsuit against the Investors alleging a violation of section 13(d) in connection with the Investors' purchase of shares. Pursuant to a consent judgment entered into between the SEC and the Investors on the day the SEC's suit was filed, the Investors, without admitting or denying the SEC's allegations, agreed to acquire additional shares of Financial General's common stock only through a cash tender offer at a price of at least $15 per share.

The management of Financial General, however, continued to oppose the Investors' attempts to acquire control of Financial General. Finally, after a proxy contest waged by Adham in the spring of 1980 and after the Investors agreed to raise their offering price to $28.50 per share for the regular common stock, Financial General and the Investors entered into a Definitive Agreement on July 25, 1980. This agreement settled all existing litigation between the company and the Investors. The agreement further provided that if the nec-

essary regulatory approvals for the tender offer were not obtained before the end of 1980, the tender offer price for the regular common stock would increase or decrease in accordance with a multiplier representing the ratio between the $28.50 price and the per share book value of the regular common stock. Because the tender offer for the regular common stock did not take place until March of 1982, the Investors under this formula were obliged to offer $33.80 per share.

To carry out the tender offer for Financial General's regular common stock, an entity called FGB Holding Corporation was established in June of 1981. FGB Holding Corporation was a wholly-owned subsidiary of Credit and Commerce American Investment, B.V. (CCAI), a Netherlands corporation that was in turn a wholly-owned subsidiary of Credit and Commerce American Holdings, N.V. (CCAH), a Netherlands Antilles corporation. The shareholders of CCAH were the three Middle Eastern Investors. FGB Holding Corporation commenced its tender offer for the regular common stock of Financial General on March 3, 1982 and eventually obtained 96% of it. This gave FGB Holding Corporation 95% of the voting equity of Financial General. FGB Holding Corporation promptly reduced the size of Financial General's board of directors and elected several new directors to the board.

Soon after FGB Holding Corporation gained voting control of Financial General, Financial General's board of directors approved a proposed merger with FGB Subsidiary, Inc. (FGB Sub), a wholly-owned subsidiary of FGB Holding Corporation. Under the merger proposal Financial General would become a wholly-owned subsidiary of FGB Holding Corporation, and the public shareholders would receive cash for their shares. The merger agreement proposed that holders of regular common stock not previously tendered would be entitled to receive $33.80 per share, while the holders of the Class A common stock would be entitled to receive $28.00 per share. FGB Holding Corporation's control of 95%

of the voting power of the company ensured that the merger agreement itself would be approved by the requisite two-thirds vote of the regular and Class A common stock voting together. Under Virginia law and Financial General's own Articles of Incorporation, however, the cancellation of the Class A shares also required a two-thirds vote of the Class A shares voting separately as a class. The merger agreement provided that if Class A approval was not given, the Class A shares would remain outstanding after the merger. On July 9, 1982, Financial General issued a proxy statement in connection with the proposed merger and cancellation of the Class A shares. At the annual meeting of shareholders on August 11, 1982, 70.6% of the Class A shares voted to cancel the Class A stock.

## II. BERG'S SECURITIES CLAIMS

Berg's Amended Complaint alleges violations of sections 10(b), 13(e) and 14(a) of the Securities Exchange Act of 1934 in connection with the August 1982 merger of Financial General and FGB Sub. Only two of these statutory provisions are still at issue in this appeal.[3] Berg charges that Financial General issued a materially false and deceptive proxy statement in violation of sections 10(b)[4] and 14(a)[5] of the Securities Exchange Act of 1934 and Rules 10b-5[6] and 14a-9[7] promulgated thereun-

---

3. In this appeal, we need not consider the alleged violation of section 13(e) of the 1934 Act, 15 U.S.C. § 78m(e), and Rule 13e-3 promulgated thereunder, 17 C.F.R. § 240.13e-3 (1985). The District Court dismissed this claim on the ground that section 13(e) provides no private right of action for money damages, and Berg has not appealed from that ruling.

4. Section 10(b) of the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

5. Section 14(a) of the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

15 U.S.C. § 78n(a).

6. Rule 10b-5 of the General Rules and Regulations under the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5 (1985).

7. Rule 14a-9 of the General Rules and Regulations under the Securities Exchange Act of 1934 provides in pertinent part:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14-9(a) (1985).

der. The majority of the alleged omissions and misstatements occur in a single paragraph on page 8 of the proxy statement. That paragraph stated that Eugene B. Casey, a director of Financial General and the largest Class A shareholder, supported the cancellation of the Class A shares at $28 per share and intended to vote his shares in favor of the merger. The paragraph went on to set forth reasons why Casey thought that the $28 price was fair. The challenged portion of the paragraph reads:

> On June 3, 1982, representatives of FGBHC [*i.e.*, FGB Holding Corporation] proposed to Eugene B. Casey, who holds approximately 30.5% of the outstanding Class A Shares and is the largest single holder of Class A Shares, that FGBHC acquire all of the Class A Shares as well as the [regular common] Shares in the Merger. After discussion, FGBHC and Mr. Casey agreed that a price of $28.00 per Class A Share in cash would be fair. In reaching such agreement, FGBHC and Mr. Casey considered, among other things, the historical market prices of the Class A Shares, the book value of the Class A Shares, the fact that the 592,569 Class A Shares currently outstanding represent only approximately 1% of the combined voting power of the Company (except with respect to matters requiring the Class A Approval ...), the fact that each Class A Share is entitled to only one vote while each Share [of regular common] is entitled to 10 votes on matters on which the [regular common] Shares and Class A Shares vote together as a class and the price to be paid to holders of [regular common] Shares in the Merger.

Proxy Statement at 8. Berg argues that this paragraph materially misrepresents both the real basis for Casey's decision to support the cancellation of the Class A shares and the substance of the discussion between Casey and FGB Holding Corporation.

Berg also alleges that, irrespective of Casey's involvement, the proxy statement's discussion of historical market prices, voting power and book value as factors supporting the fairness of the $28 price for the Class A shares was materially misleading. Finally, Berg contends that the proxy statement failed to disclose certain facts surrounding the preparation of a fairness opinion by First Boston Corporation, the professional investment advisor to Financial General, that severely limited the worth of that opinion. The District Court granted the defendants' motion to dismiss, concluding that the proxy statement contained no material misrepresentations or omissions, and Berg appealed. After setting forth the standard governing our review of the District Court's assessments of materiality, we will proceed to evaluate each of the District Court's materiality determinations.

### III. THE STANDARD OF REVIEW

Only material misrepresentations or omissions in a proxy statement are actionable under section 14(a) and section 10(b) of the Securities Exchange Act of 1934. The Supreme Court has enunciated the standard of materiality under section 14(a) as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (footnote omitted).

■ This standard of materiality also governs section 10(b). Facts are material

if a substantial likelihood exists that a reasonable shareholder would consider them important in making an investment decision. *See, e.g., Austin v. Loftsgaarden,* 675 F.2d 168, 176 & n. 17 (8th Cir.1982); *Bell v. Cameron Meadows Land Company,* 669 F.2d 1278, 1281 (9th Cir.1982); *Panter v. Marshall Field & Co.,* 646 F.2d 271, 289 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

■ The issue of materiality is inevitably a mixed question of law and fact. It involves a delicate assessment of the inferences a reasonable shareholder would draw from a proxy statement and a projection of the significance of these inferences to the hypothetical reasonable shareholder. Only if the alleged misrepresentations or omissions are so clearly unimportant to an investment decision that reasonable minds cannot differ should the issue of materiality appropriately be resolved as a matter of law by summary judgment or a motion to dismiss. *See TSC Industries v. Northway,* 426 U.S. at 450, 96 S.Ct. at 2132. This is the stringent standard under which we must now evaluate the District Court's determination that Berg's complaint set forth no material misstatements or omissions.

## IV. ALLEGED DEFECTS IN THE PROXY STATEMENT

### A. *The Role of Eugene Casey*

The most significant of Berg's challenges to the proxy statement involves the portrayal of Eugene Casey's decision to vote his Class A shares in support of the merger and cancellation of the Class A stock. Berg alleges that the proxy statement's portrayal of Casey is false and misleading in four ways. First, Berg argues that the placement of the description of Casey's discussion with FGB Holding Corporation within a section of the proxy statement entitled *"Reasons for, and Basis for the Terms of, the Merger; Fairness"* gives rise to a false impression that Casey played an institutionalized role in protecting the interests of all the Class A shareholders in his discussions with FGB Holding Corporation. Second, Berg contends that the proxy

statement misrepresents the factors that Casey considered in concluding that the $28 price was fair. Third, Berg asserts that the proxy statement's failure to disclose that Casey was old and in fear of imminent death, and so felt a pressing need to convert his holdings to cash, rendered the proxy statement materially misleading. Finally, Berg urges that the description of the meeting between Casey and FGB Holding Corporation was materially false because absolutely no "negotiations" occurred between Casey and FGB Holding Corporation.

### 1. *Casey's Purported Role as "Negotiator" for the Class A Shareholders*

■ On the first issue, we agree with the District Court that the proxy statement in no way implies through its organizational structure or otherwise that Casey represented the interests of the Class A shareholders as a group. While a Class A shareholder might reasonably conclude on his own that "what was good enough for Casey was good enough for him," the inference that Casey served in a representative capacity as a "negotiator" on behalf of the entire class of Class A shareholders cannot reasonably be drawn from the proxy statement's description of Casey's role or its placement of this description. The proxy statement cannot reasonably be read to imply that Casey sought to protect the interests of anyone but himself.

### 2. *The Factors Considered by Casey*

■ Berg next contends that the proxy statement was false and misleading in its depiction of the factors that led Casey to conclude that $28 was a fair price for the Class A shares. Berg alleges that Casey never considered the historical market price, book value or *relative* voting power of the Class A shares. The District Court concluded that any inaccurate portrayal of the factors considered by Casey in reaching his conclusion that the price of $28 per share was fair should be deemed immaterial as a matter of law. The District Court,

relying on the Second Circuit's decision in *Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1 (2d Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984), reasoned that the actual subjective motivations behind Casey's recommendation were not material to an informed decision by the other Class A shareholders. This analysis, however, rests on a misreading of *Data Probe.* In *Data Probe* the proxy statement at issue fully described certain guarantees of employment negotiated by the company directors and therefore fully disclosed the directors' conflict of interest. *Data Probe* held only that there was no additional need for the proxy affirmatively to announce that the director-beneficiaries preferred one offer over another because of the employment guarantees. *See* 722 F.2d at 5. The present case is the reverse of *Data Probe.* Here, by contrast, the proxy statement, after announcing that Casey endorsed the $28 price, went on to recount the factors Casey considered in evaluating its fairness. Once the proxy statement purported to disclose the factors considered by Casey, there was an obligation to portray them accurately. *See Levinson v. Basic Inc.,* 786 F.2d 741, 747 (6th Cir.1986); *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1317 (5th Cir.1977), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978). The drafters of the proxy statement could not legitimately attribute to Casey factors which he did not actually consider, thereby making his decision appear well-informed, and then shield themselves by arguing that Casey's subjective motivations are not material.

■ Although the District Court erred in its reliance on *Data Probe,* we nonetheless conclude that it properly dismissed Berg's allegation of inaccuracy. Berg has raised no genuine issue of falsity with respect to Casey's consideration of the factors enumerated in the proxy statement. In the face of the defendants' motion for summary judgment, Berg could not rest on his allegation of falsehood without some further support for his claim that Casey did not consider the factors attributed to him.

Because Berg would bear the burden at trial of demonstrating the proxy's falsity, Berg had the burden of showing that a genuine issue of fact existed concerning the truth of that portion of the proxy statement. *See Celotex Corporation v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Berg's allegation that Casey did not consider all the factors in the proxy statement is based on mere speculation, however. Nowhere in Casey's deposition did Casey indicate that he did not *consider* all the factors set forth in the proxy statement. In support of a genuine issue of falsity Berg can point only to a portion of Casey's deposition in which Casey testified that at the time of the deposition he could not recall whether he had in fact *discussed* with the FGB Holding Corporation representatives the historical market price, the relative voting power, the book value, and the market price of the Class A shares. *See* Casey Deposition at 43–45. At another point in the deposition, however, Casey explicitly stated that he thought the $28 price was fair because "[i]t was considerably higher by 20 or 30 percent than the book value and the selling price." Casey Deposition at 96. Casey's testimony that he did not recollect whether he had *discussed* certain factors with the FGB Holding Corporation representatives does not create a genuine issue of fact concerning whether Casey failed to *consider* the factors attributed to him, especially when Casey explicitly testified that he did consider the book value and selling price.

Nor can we discern any circumstantial evidence of falsity. While situations might be imagined where the book value or historical market price greatly exceeded the offered price for shares and thereby cast doubt on the assertion that an individual could have considered these factors as supporting the fairness of an offered price, in the instant case the $28 price was greater than the book value and historical market price of the Class A shares. We therefore find that summary judgment was appropriate because the evidence is such that no

reasonable jury could find the proxy's depiction false and hence return a verdict for Berg on this claim. *See Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2509–2512, 91 L.Ed.2d 202 (1986).

### 3. *Casey's Alleged Pressing Need for Liquidity*

In addition to arguing that the proxy statement inaccurately described the five factors which "among other things" Casey considered in concluding that $28 was a fair price, Berg also contends that the description of the five factors was incomplete. Berg argues that having chosen to describe some of the factors in Casey's decision, the proxy statement was obligated to disclose that Casey was elderly and infirm and felt a "pressing need" to sell his Class A shares to enhance his liquidity. At his deposition Casey testified that one reason he accepted FGB Holding Corporation's offer to purchase his Class A shares was a concern about settling his estate. Casey Deposition at 39–40. Berg argues that the omission of this reason was material since, as written, the proxy indicated that Casey's reasons for concluding that $28 was a fair price were universally applicable to the other Class A shareholders.

While it is true that the proxy statement does not disclose anything about Casey's liquidity preference, we find that the District Court properly dismissed Berg's claim with respect to this omission. Casey's personal plan for using the proceeds from the sale of his Class A stock was not a factor he considered in his evaluation of the *fairness* of the $28 price. Nothing in Casey's deposition testimony suggests that his desire for liquid assets in any way influenced his evaluation of the *fairness* of the $28 price.

Berg nonetheless contends that Casey's desire to sell his Class A shares could have led him to accept an otherwise unfair price, pointing to a statement by Casey that:

It is just my judgment that I had better take what was offered to me and run. After all, I was getting close to the end and I had some dispositions to make of

my stock, of my estate so that is the reason why I took it.

Casey Deposition at 39 (quoting Casey Deposition in *Kas v. Financial General Bankshares, Inc.,* Civil Action No. 82–1996 at 32–33. Berg, however, has taken this statement that Casey would "take what was offered ... and run" out of the context in which it arose. The statement referred solely to what Casey viewed as the powerlessness of the Class A shareholders vis-a-vis the Investors who controlled 95% of the voting power of Financial General. Casey's testimony indicates that he rated this powerlessness as dwarfing any other consideration in his decision to sell his shares. *See, e.g.,* Casey Deposition at 40 (discussing Investors' corporate power). Thus, for example, Casey testified that "the eastern investors had taken over the company. I had learned that the dilution factor was so great, 1 to 10, [that] I had no further power, and I wanted to reduce my holdings totally in Financial General, and I set a price that I thought reasonable to both sides...." Casey Deposition at 89. These statements concerning voting power are in no way inconsistent with Casey's other testimony that he considered the price at which he sold to be a fair one.

### 4. *The Alleged Lack of "Discussions" Between Casey and FGB Holding Corporation*

We turn finally to Berg's argument that the proxy statement is false and misleading in suggesting that "negotiations" occurred between Casey and the representatives of FGB Holding Corporation. While we do not credit Berg's suggestion that the proxy statement can reasonably be read to indicate that formal "negotiations" in the strict sense of that word occurred between Casey and FGB Holding Corporation, we are persuaded that a jury could find that the proxy's description of "discussions" between Casey and the representatives of FGB Holding Corporation was false and misleading. The proxy statement can reasonably be read to suggest that Casey and Clifford arrived at the $28 figure after

*jointly* considering the several factors set forth in the proxy—voting power, historical market prices, etc. Viewing the evidence in the light most favorable to Berg, Casey's deposition creates a factual conflict over whether any discussion took place between Casey and Clifford in arriving at the $28 figure. *See* Casey Deposition at 43–45, 53, 63, 91.

■ Although the proxy statement's depiction of the discussion between Casey and Clifford might reasonably be considered false or misleading, we conclude that no reasonable investor would be influenced by whether Casey and Clifford actually engaged in an explicit "discussion" of the factors in the proxy statement, so long as Casey himself considered those factors before selling. Any additional guarantee of the reasonableness of the $28 price that might have been inferred from the existence of some back-and-forth "discussion" between Casey and Clifford does not appear to us material enough to withstand the defendants' motion to dismiss.

## B. *The Alleged Defects Concerning Historical Prices, Book Value and Voting Power*

### 1. *Historical Prices*

■ The other alleged defects in the proxy statement are even less consequential.[8] Berg first argues that the inclusion of "historical market prices" as a factor supporting the fairness of the $28 price for the Class A shares conveys the misleading impression that the Class A shares had *always* traded for less than the regular common shares. As Berg correctly points out, the trading prices of the Class A and regular common shares in fact were roughly equal from 1972 to 1977. The differential between the trading prices of the two classes of stock developed around the time that the Middle Eastern Investors bought their first block of regular common shares late in 1977.

This purported defect in the proxy statement cannot survive scrutiny. Any inference that a shareholder might draw from the phrase "historical market prices" that the Class A stock historically traded at a discount to the regular common stock would be neither false nor misleading. The Class A stock had traded at a discount for the past several years. Berg's falsity argument thus rests entirely on his contention that the proxy statement suggests that the price for the two classes of stock had *always* been different. Nothing in the proxy statement supports a congruence between the words "historically" and "always."

In a related argument, Berg asserts that the defendants engaged in a manipulative scheme to distort the historical market price of the Class A stock, claiming that the three Investors had always intended to acquire the Class A stock but had disavowed this intention in order to enable the Investors eventually to acquire the Class A shares at an artificially low price. The effect of this scheme, according to Berg, was that by the time of the merger the defendant Investors were able to justify a low price for the Class A shares by pointing to several years of differences in the trading prices of the two classes of shares.[9]

---

**8.** The defendants contend that the "central thrust" of Berg's claim is an attack on the fairness of the terms of the merger which does not state a federal cause of action under *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). The District Court properly rejected this argument. Where a complaint alleges misrepresentations or omissions from a proxy statement, a court must evaluate the materiality of the alleged defects. *See Kas v. Financial General Bankshares, Inc.,* 796 F.2d 508, 512–13 (D.C.Cir.1986). *Santa Fe* does not authorize a court to ignore otherwise cognizable allegations in a complaint and instead engage in mind reading to determine whether the plain-

tiffs' "true" motivation for filing their complaint was dissatisfaction with the price offered for their stock.

**9.** Berg alleges that this failure to disclose the Investors' intention to acquire the Class A shares amounted to a manipulative scheme in violation of section 10(b) of the Securities Exchange Act. Section 10(b) imposes liability for such manipulative schemes only "in connection with the purchase or sale of any security." *See* 15 U.S.C. § 78j(b). Berg's claim, therefore, states no cause of action independent of the "purchase or sale" which followed the issuance

*See* Brief of Plaintiffs-Appellants at 28–29. This argument assumes that the price of Class A stock would have risen if the Investors had disclosed that they would eventually try to take Financial General private, reflecting the premium that the Class A shareholders would be able to extract due to their ability to keep Financial General public. The price rise could not, of course, reflect any premium for voting control of Financial General since the Class A shares together represented only 1% of the voting equity of Financial General and the Investors had no need to control the Class A shares to gain voting control of Financial General.

Berg's argument that the Investors' failure to disclose their intention to take Financial General private prevented the market from incorporating the Class A stock's potential "blocking power" into its trading price is unsupported speculation. Until FGB Holding Corporation acquired voting control of Financial General, the market accurately valued the inchoate ability of the Class A shares to extract a premium from any speculator who might attempt to acquire control of Financial General and then take it private. This is especially so since it was well-known that the Investors would make a tender offer for the regular common stock of Financial General. Only after FGB Holding Corporation actually gained voting control of Financial General in April 1982 did the Class A's "blocking power" take on concrete significance. Berg has thus advanced no coherent theory whatsoever to support his inferential argument that disclosure of the Investors' intentions would have affected the historical market price for the Class A shares. Until the Investors or any other individual gained voting control of Financial General, the ability of the Class A stock to keep the company public had no special significance which the market failed to value. Thus, the failure of the Investors to disclose their "true" intentions in 1978 would not logically have affected the historical market price for the Class A shares.

of the proxy statement and the shareholders'

### 2. *Book Value*

Berg further contends that the proxy statement's reference to the book value of the Class A shares as a factor supporting the fairness of the $28 price gives the misleading impression that the book value of the Class A shares was less than the book value of the regular common shares. We do not think any reasonable shareholder could read the proxy statement in this way. Berg's "misstatement" rests on a contorted inference. Because the proxy statement enumerated factors considered by Casey, First Boston and Financial General's board of directors to support the fairness of the $28 price for the Class A shares, and that price was less than the price for the regular common shares, Berg would first infer from the proxy statement that each of these factors also supported the *differing treatment* of the two classes of stock, and then infer that the two classes of stock necessarily differed with respect to each factor listed in the proxy.

The assumption that every factor listed in the proxy could be read as directed solely toward explaining the difference between the prices paid for the Class A and regular common stock is not, however, a reasonable one. A factor may support the fairness of the $28 price for the Class A shares without necessarily supporting the *difference* in the prices paid for the two classes of stock. Fairness involves not only the differential in price between the Class A and regular common shares but also the absolute amount being offered for the Class A shares—why $28 was more appropriate than, for example, $10.

The latter portion of the very paragraph in which the challenged discussion of book value occurs, moreover, makes it quite plain that the difference in the book value did not purport to explain the difference in offering price for the two classes of stock. The proxy statement explains that:

> [The price to be paid for the regular common] is equal to 1.583333% of the

decision to cancel the Class A shares.

Company's "Per Share Book Value".... The price of $28.00 per Class A Share ... is equal to 1.311475% of the Company's "Per Share Book Value"....

Proxy Statement at 8. These sentences indicate that the two classes of stock have the same book value and that the difference in the price being offered reflects a difference in the multiplier being applied to the book value rather than a difference in the book value itself.

### 3. Voting Power

Berg next challenges that portion of the proxy statement relating the fairness of the $28 price to the fact that "each Class A Share is entitled to only one vote while each Share [of regular common] is entitled to 10 votes on matters on which the [regular common] Shares and Class A Shares vote together as a class." According to Berg, this clause falsely suggests that differences in the voting rights of the Class A and regular common shares justified a lower price for the Class A shares when in fact those differences supported the payment of a higher price for the Class A shares than for the remaining shares of regular common. Berg suggests that the Class A shareholders and the holders of the remaining four percent of the regular common shares not acquired by FGB Holding Corporation were equally powerless with respect to matters in which the two classes of stock voted together since FGB Holding Corporation controlled 95% of the voting equity of the company. The Class A shares, however, did control whether or not Financial General became a privately-owned corporation.

Once again Berg's challenge hinges on his assumption that the proxy statement presents voting rights as a factor justifying a price differentiation, thereby implying that the Class A stock was inferior to the regular common stock with respect to this factor. Absent this premise, Berg's

argument that the proxy statement is false and misleading fails. Berg cannot credibly contend that the proxy statement in any way obscures the fact that the affirmative vote of the Class A shares, voting as a class, was necessary to cancel the Class A shares and take Financial General private. This significance of the Class A vote was disclosed in numerous places throughout the proxy. *See, e.g.*, Proxy Statement at 1. As we have already discussed, Berg's faulty premise dooms this contention as well.

### C. The First Boston Opinion

Finally, Berg contends that the proxy statement contained certain material omissions with respect to the one-page fairness opinion rendered by First Boston Corporation, Financial General's professional investment advisor. According to Berg, the proxy statement should have disclosed: (1) that prior to preparing the opinion, a First Boston representative had inquired why the price being offered for the Class A stock was not the same as the price for the regular common stock; and (2) that First Boston had only four days (or two business days) to prepare the fairness opinion.[10] Berg takes the position that these two facts would have affected a shareholder's assessment of the worth of the First Boston Opinion, which was attached to the proxy as Annex III, and thus would also have affected the shareholder's evaluation of the board of directors' determination, based in part on the First Boston Opinion, that $28 represented a fair price for the Class A stock.

■ The District Court concluded that the proxy contained no material misstatements or omissions with respect to the fairness opinion. Berg's first argument, that the materiality of the First Boston inquiry about a higher price for the Class A shares was an issue for the jury, misses its

---

**10.** Berg argues that this time pressure to produce the fairness opinion actually resulted in serious oversights by First Boston. Berg, however, alleges no violation of sections 10(b) and 14(a) in connection with these oversights but merely offers them as illustrations of how time pressure is material since it can create errors in analysis. *See* Reply Brief of Plaintiffs-Appellants at 20 n. 13.

mark. In their motion for summary judgment, the defendants offered the deposition of William B. Weaver, the representative of First Boston who prepared the fairness opinion and inquired about the availability of a higher price for the Class A shares. Weaver indicated that the omitted inquiry concerning the difference between the prices for the two classes of stock was a "question [that] comes up in every fairness meeting." Weaver Deposition at 87. He testified that his inquiry in no way indicated that he or First Boston believed a higher price might in fact be available. *See* Weaver Deposition at 83–85. In sum, the figure mentioned by First Boston was not derived by First Boston and did not represent its own calculation of a potentially available price. Weaver further testified that he thought the Class A stock was worth less than the regular common. His inquiry did not indicate any belief that the Class A and regular common stock were worth the same amount. *See* Weaver Deposition at 92. In the face of this showing, Berg came forward with no counterevidence that any disputed issue of fact existed with respect to the materiality of the alleged omission concerning the First Boston inquiry. The remote possibility that a shareholder might misinterpret the First Boston inquiry as indicating that First Boston believed a higher price might be available does not by itself create an issue of materiality.

Berg's second argument, concerning the length of time in which the First Boston opinion was prepared, can be easily dismissed as well. Although First Boston may have had only four days to prepare an oral briefing on fairness for Financial General's board of directors, the First Boston representative testified that First Boston had over a month to prepare the written opinion which was included in the proxy materials. *See* Weaver Deposition at 80. We thus cannot find that any time pressure was imposed on First Boston which a reasonable shareholder might consider important in evaluating the worth of the First Boston fairness opinion. Accordingly, we conclude that the District Court properly dismissed this claim.[11]

## V. THE DISMISSAL OF THE RICO DAMAGE ACTION

Berg's Amended Complaint also contained a damage action against the three Investors and CCAI for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 (RICO). The focus of the RICO statute is on "racketeering activity," which it defines to include any federal offense involving fraud in the sale of securities that is punishable under federal law. *See* 18 U.S.C. § 1961(1). Section 1962 of RICO makes it unlawful to acquire or maintain any interest "through a pattern of racketeering activity" in an enterprise engaged in interstate commerce. It also prohibits conducting or participating in the conduct of such an enterprise "through a pattern of racketeering activity." *See* 18 U.S.C. § 1962. A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity, *see* 18 U.S.C. § 1961(5), which are in some way linked. As the Supreme Court has explained, it is the "factor of *continuity plus relationship* which combines to produce a pattern." *Sedima, S.P.R.L. v. Imrex Company*, — U.S. —, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985) (quoting Senate Report) (emphasis in original).

Under RICO, a private plaintiff may bring a civil action to recover treble damages for injury to his business or property

---

**11.** Because we find that the District Court properly dismissed Berg's challenges to the proxy statement for failing to raise genuine issues of falsity and materiality, we need not reach the Court's alternative determination that Berg's complaint must be dismissed for failure to demonstrate reliance. The issue of reliance in the federal securities law presents many complicated questions which this Circuit has not yet fully addressed.

Having determined that Berg cannot maintain his federal claims, we also find that the District Court properly declined to exercise its discretion to adjudicate Berg's pendent claims. *See Financial General Bankshares, Inc. v. Metzger*, 680 F.2d 768 (D.C.Cir.1982).

stemming from a violation of the substantive provisions of RICO. *See* 18 U.S.C. § 1964(c). Berg's Amended Complaint alleges that the three Investors and CCAI engaged in a pattern of racketeering activity consisting of securities fraud on two occasions. The first occasion involved the violation of sections 13(d) and 10(b) of the Securities Exchange Act of 1934 in connection with the Investors' initial purchases of Financial General's regular common stock in 1977 and 1978. Specifically, Berg contends that the four defendants failed to make certain required disclosures and filings with the SEC in connection with these purchases. *See* Amended Complaint ¶ 55(a). The second incident of racketeering activity involved the violation of sections 10(b), 13(e) and 14(a) of the Securities Exchange Act in connection with the proxy statement issued by Financial General concerning the merger whereby Financial General became a wholly-owned subsidiary of FGB Holding Corporation. *See* Amended Complaint ¶ 55(b)–(d).

The District Court dismissed Berg's RICO claim on the ground that Berg had not alleged that the defendants had been criminally convicted of the predicate securities law violations which formed the pattern of racketeering activity for which damages were sought. The District Court adopted the reasoning of the Second Circuit's decision in *Sedima, S.P.R.L. v. Imrex Company,* 741 F.2d 482 (2d Cir.1984), and held that a criminal conviction for predicate acts of racketeering activity is a prerequisite to the maintenance of a private civil RICO action. After the District Court dismissed the RICO claim and prior to oral argument in this court, the Supreme Court rejected the Second Circuit's prior-conviction requirement. *See Sedima, S.P.R.L. v. Imrex Company,* —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Berg correctly argues on appeal that his RICO claim should not have been dismissed solely for its failure to allege the prior criminal conviction of the defendants. We nonetheless affirm the District Court's dismissal of the RICO claim in light of our conclusion that the District Court properly dismissed Berg's challenges to the proxy statement issued in connection with the August 1982 merger.

■ Liability for treble damages under section 1964(c) of RICO requires a pattern of two or more acts of securities fraud. The District Court found that Berg had properly alleged a pattern of racketeering activity "consist[ing] of two separate but related securities frauds within a ten year period. The first violation was in connection with the initial purchase of shares in late 1977 and early 1978, and the second violation was in connection with the merger in 1982." *Berg v. First American Bankshares, Inc.,* No. 83–3887, slip op. at 8 (D.D.C. Oct. 19, 1984). Three of the four predicate acts of racketeering activity alleged in Berg's Amended Complaint, however, concern misstatements and omissions in the proxy statement issued in connection with the 1982 merger between Financial General and FGB Sub. *See* Amended Complaint ¶ 55. These predicate acts are insufficient for liability under the securities laws and therefore cannot provide the basis for liability under RICO.

Our previous discussion makes clear that the defects in the proxy statement do not amount to violations of sections 10(b) and 14(a) of the 1934 Act. Berg's Amended Complaint also alleges, however, that the proxy statement violates section 13(e) of the 1934 Act. We conclude that the alleged violation of section 13(e), like the alleged violations of sections 10(b) and 14(a), is insufficient to constitute a predicate act of racketeering activity. Liability under section 13(e) and Rule 13e–3 promulgated thereunder requires that any misrepresentation or omission be material. Our conclusion that any defects in the proxy statement were immaterial for purposes of liability under sections 10(b) and 14(a) applies equally to section 13(e), and accordingly we conclude that the alleged violation of section 13(e) in connection with the proxy statement cannot constitute a predicate act for Berg's RICO claim. We therefore find that Berg's Amended Complaint has not sufficiently alleged a pattern of

racketeering activity, and we dismiss his RICO claim on this ground.

CONCLUSION

We conclude, along with the District Court, that Berg cannot maintain an action under sections 10(b) and 14(a) of the 1934 Securities Exchange Act. We also conclude that Berg's RICO claim fails to allege sufficiently a pattern of racketeering activity and must therefore be dismissed. Accordingly, the judgment of the District Court is

*Affirmed.*