**TORCHMARK CORPORATION and
United Investors Management
Company, Plaintiffs,**

v.

**Joseph R. BIXBY, et al., Defendants.**

No. 88–4534–CV–W–5.

United States District Court,
W.D. Missouri, W.D.

Dec. 21, 1988.

Richard H. Ralston, Polsinelli, White, Vardeman & Shalton, Kansas City, Mo., Barbara Robbins, Douglas S. Liebhafsky, Andrew C. Houston, Wachtell, Lipton, Rosen & Katz, New York City, for plaintiffs.

John C. Dods, III, Shook, Hardy & Bacon, Kansas City, Mo., for defendants.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

This is an individual and derivative action brought by plaintiff Torchmark Corporation ("Torchmark") and its subsidiary, United Investors Management Company, in connection with plaintiffs' attempt to acquire control of defendant Kansas City Life Insurance Company ("KCL" or the "Company"), a publicly held corporation. The defendants are the company and all fifteen members of its Board of Directors (the

"Board"). The plaintiffs seek both mandatory and prohibitory injunctive relief. The plaintiffs' claims are brought under §§ 13(d), 13(e), 14(d), and 14(e) of the Securities and Exchange Act (hereinafter "The Williams Act"), and the rules and regulations promulgated thereunder by the Securities and Exchange Commission ("SEC"), and under Missouri statutory and common law.

The plaintiffs move for preliminary injunctive relief. They request that the Court intervene and enjoin the defendants from purchasing any KCL shares beginning December 7, 1988. Plaintiffs also request that the Court intervene and mandate that the KCL Board (1) appoint a special committee of independent directors and investment consultants to meet apart from the KCL Board; (2) negotiate in good faith with Torchmark; and (3) provide Torchmark with non-public information concerning KCL. The plaintiffs allege that defendants Joseph R. Bixby, W.E. Bixby, Robert Phillip Bixby, Katherine A. Bixby–Haddad and other defendants have engaged in an unlawful, ongoing scheme to entrench management and consolidate majority control of KCL in the hands of the Bixby family. Plaintiffs argue that this case presents the classic situation of an entrenched management abusing its control position to perpetuate itself in office regardless of the consequences to shareholders. Plaintiffs claim that if injunctive relief is denied, purchases by defendants would permanently lock up control for management of the company and insulate the controlling group from any takeover challenge.

The defendants contest the plaintiffs' characterization of the Company's activities as a scheme to further entrench the control of Bixbys. The defendants argue that (1) the Company stock-purchase and self-tender programs were lawful and appropriate to accomplish legitimate corporate purposes; (2) the Board properly rejected, in accordance with its fiduciary duties, plaintiffs' first offer as financially inadequate and not in the best interests of the Company's shareholders; (3) that the Bixbys, as shareholders, have (a) the absolute right to retain their long-term investment in the Company, and (b) have fully complied with the SEC disclosure requirements; and (4) that the Board is not required to accord preferential treatment to Torchmark in its quest to acquire control of the Company. The defendants also move to dismiss the derivative claims in this action on the basis that Torchmark cannot fairly and adequately represent the shareholders, as required by Fed.R.Civ.P. 23.1, because its interests are antagonistic to the interests of its fellow KCL shareholders.

For the reasons set forth in this opinion, the plaintiffs' request for preliminary injunctive relief will be denied.

## I. FACTUAL BACKGROUND AND FINDINGS

Defendant Kansas City Life is a Missouri legal reserve life insurance corporation which was organized before the turn of the century. Kansas City Life has more than $14 billion of insurance in force, more than 1,700 active agents and employs 630 people in the Kansas City area. Although Kansas City Life's shares are publicly held, approximately 48% of its stock continues to be owned directly or beneficially by descendants of one of the first presidents of Kansas City Life—J.B. Reynolds. Mr. Reynolds was the maternal grandfather of current president J.R. Bixby, and current vice-chairman of the Board and executive vice-president W.E. Bixby. Katherine Bixby–Haddad is the daughter of J.R. Bixby, and R. Phillip Bixby is the son of W.E. Bixby. No other Bixby family members are directors. Since approximately 1970, neither J.R. Bixby nor W.E. Bixby has purchased any additional shares of KCL, other than through employee benefit plans offered by the Company.

KCL has fifteen directors, four of whom are non-management, independent directors—Ilus W. Davis, Michael J. Ross, Larry Winn, Jr., and Wood Arnold II. Defendants John D. Petrie, Richard L. Finn, Francis P. Lemery, H. Marshall Chatfield, and Daryl D. Jensen are officers of KCL or its subsidiaries as well as directors. Defendant David D. Dysart is a retired execu-

tive vice-president of KCL. Defendant James T. Allen is a former agent of KCL.[1]

In 1986, the Board considered adopting certain amendments to its Articles of Incorporation and By-laws which might have the effect of deterring an unsolicited proposal to acquire KCL. A committee of independent directors (the "independent committee") controlled this process. Ilus W. Davis, a former mayor of the City of Kansas City, Missouri, with over 49 years of experience as a corporate attorney, chaired the independent committee. Michael J. Ross, a St. Louis banker, and J.T. Allen, a former agent of the Company from Denver, Colorado, were members of the independent committee. Over a period of nine months, the independent committee considered numerous strategies to protect the KCL shareholders from possible take-over attempts. The independent committee unanimously recommended to the Board the adoption of certain amendments to its Articles of Incorporation and By-laws. The Board unanimously adopted the recommendations of the independent committee as to the By-law amendments and called a special meeting of the Company's shareholders to consider certain amendments to the Articles of Incorporation. The shareholders approved these charter amendments.

In 1987, the Board authorized the Company to enter into an open market stock repurchase program of shares of its common stock. The program was instituted because it was believed by the Board to be a sound investment of company funds. This repurchase program continued through August of 1988. The program culminated in the purchase of approximately 390,000 shares on August 26, 1988.[2]

Plaintiff Torchmark Corporation is a Delaware corporation headquartered in Birmingham, Alabama. Torchmark, through its subsidiaries, engages in a variety of businesses, including life and health insurance, and individual and institutional investment management and financial planning. R.K. Richey is chairman and chief executive officer of Torchmark. Jon W. Rotenstreich is president of Torchmark. Plaintiff United Investors Management Company ("United Investors") is a majority-owned subsidiary of Torchmark Corporation headquartered in Birmingham, Alabama. United Investors is a mutual fund and oil-and-gas management and insurance holding company. Its principal subsidiaries include Waddell & Reed, Inc. ("W & R"), a broker-dealer and investment advisor headquartered in Kansas City, which acts as the investment manager, distributor and underwriter of sixteen mutual funds and United Investors Life Insurance Company ("UILIC"), a Missouri insurance company which offers life insurance and annuity products marketed primarily by W & R.

On August 26, 1988, Richey and Rotenstreich, as representatives of Torchmark, met for approximately fifteen minutes with W.E. Bixby and told him that Torchmark was prepared to offer $42.50 per share of KCL stock contingent upon a controlling interest being tendered. Mr. Bixby told them his stock was not for sale and that he believed his brother, J.R. Bixby, had no interest in selling his KCL shares. At this point, Richey indicated that they would have to proceed in an unfriendly manner and would be contacting their attorneys.

Sometime later that day, W.E. Bixby met with Richard L. Finn, senior vice-president of finance and director of KCL. W.E. Bixby described what had transpired in his meeting with Torchmark's representatives. Finn told W.E. Bixby that KCL had purchased 389,810 shares in the open market as part of KCL's ongoing repurchase program at approximately 10 a.m. that morning. After W.E. Bixby left, Finn had a telephone conversation with David Wittig of Kidder, Peabody & Co., Inc. ("Kidder Peabody"). Wittig advised KCL to retain counsel and wait for Torchmark's next

---

1. Plaintiffs categorize defendant J.T. Allen as an "inside" director because he was both a general agent and agency consultant with KCL. Defendants, however, describe his affiliation with KCL as that of an independent agent.

2. In May and October of 1987, the Board authorized the repurchase of up to 250,000 and 350,000 shares of KCL capital stock, respectively.

move. Wittig speculated as to what that move might be and stated that it is important to try and nip this in the bud.

Torchmark delivered a letter dated August 29, 1988, to the directors of KCL, proposing the acquisition of KCL through a merger. The price of $42.50 per KCL share in cash was proposed. The letter stated that the Torchmark proposal was not conditioned on financing and was subject to approval by KCL's directors and stockholders, and the SEC.

A Board meeting was called to consider the Company's response to the Torchmark letter. In preparation for this meeting, Marshall Chatfield, a director and senior vice-president and secretary of KCL, asked each of the Bixby shareholders and certain senior management employees and directors if they were interested in selling their shares. Those shareholders who beneficially owned more than 50% of all issued and outstanding shares, individually and separately advised the Board that they had no intention of selling their shares to Torchmark. Each individually signed a unilateral and non-binding "statement of intention" to that effect; these statements were presented to the Board. Plaintiffs contend that the existence of these statements evidences the formation of a "group" and thus triggered the duty to file a Schedule 13D with the SEC.[3]

On August 31, 1988, the Board, including outside directors, discussed the Torchmark proposal and the fact that owners of more than 50% of KCL stock said they would not sell. The Board also consulted with legal counsel and financial advisers. The Board authorized J.R. Bixby, chairman of the Board, to advise Torchmark that it was not appropriate to enter into acquisition discussions with Torchmark on its present proposal. J.R. Bixby advised Torchmark by letter of the Board's decision and told Torchmark "certain shareholders of Kansas City Life which own a majority of the outstanding shares, including the Bixby family, have stated their intention in writ-

ing not to sell their shares to you or to enter into discussions with you."

On October 24, 1988, the KCL Board met again. Certain executive officers of the Company presented a formal proposal for an issuer-tender offer by KCL (the "self-tender offer") to purchase up to 950,000 shares of its common stock (approximately 13% of its then-outstanding shares). KCL directors testified that the purpose of this offer was to provide an alternative investment vehicle for Company funds and a mechanism for increasing the value of the company's stock. At this meeting, the Board was advised by Finn that the proposed self-tender offer at a premium over the then-current market price, would be beneficial to the Company and its shareholders. At the meeting, the Board determined that the price of the self-tender offer would be $5.00 per share above the market price on the second trading day immediately prior to the commencement of the self-tender offer. The $5.00 premium figure was arrived at after consultation with KCL's investment advisor.

On November 1, 1988, the Company began its self-tender offer. The Company's offer to purchase disclosed in bold on the front page that "NEITHER THE COMPANY NOR ITS BOARD OF DIRECTORS MAKES ANY RECOMMENDATION TO ANY SHAREHOLDER WHETHER TO TENDER ALL OR ANY SHARES. EACH SHAREHOLDER MUST MAKE HIS OWN DECISION WHETHER TO TENDER SHARES AND, IF SO, HOW MANY SHARES TO TENDER AND AT WHAT PRICE OR PRICES." This position of the Board was prominently stated at two other places in the Company's offer to purchase.

The offer to purchase described the offer as an attractive investment opportunity that would benefit the Company and its shareholders. In addition, the offer included the following statements:

> Messrs. J.R. Bixby and W.E. Bixby, executive officers and directors of the company, have informed the company that they

---

**3.** Plaintiffs also contend that the non-disclosure of these statements is but one part of a pervasive, fraudulent scheme by the Bixbys with the acquiescence of KCL's board to secure the Bixbys' control of KCL.

do not intend to tender any shares owned or controlled by them pursuant to the offer. Including shares beneficially owned or controlled by, or held in trust for the benefit of members of their respective families, in shares held for their benefit by the employee plans, they beneficially own or control approximately 49.4% of the shares outstanding as of October 31, 1988; upon consummation of the offer, this ownership percentage will increase to approximately 56.8%, assuming that 950,000 shares are purchased pursuant to the offer.

From time to time, the company has received from third parties indications of interest in acquiring the company, some involving prices in excess of the maximum prices being paid for shares pursuant to the offer. No substantive negotiations have resulted from these indications of interest. The increase in the Bixbys' percentage of ownership will have the effect of reducing the likelihood of success of an acquisition proposal for the company that is opposed by them, although they have not agreed to act in concert with respect to their shares, there can be no assurance they will respond in the same manner to any particular acquisition proposal. In addition, the reduction in the company's cash as a result of the confirmation of the offer might lessen the attractiveness of the company to persons considering an acquisition of the company."

The self-tender offer was scheduled to expire on December 2, 1988.

On November 14, 1988, Torchmark purchased 100 shares of KCL stock, which it currently owns.

Frustrated by KCL's management's refusal to discuss an acquisition, on November 16, 1988, Torchmark commenced a fully financed cash tender offer for all outstanding shares of KCL at $43.50 per share. The Torchmark offer was initially conditioned on a majority of the outstanding shares being tendered. Following the completion of the offer, Torchmark intends to seek to have KCL consummate a merger with a subsidiary or affiliate of UILIC in which the remaining public shareholders of KCL would receive in cash the same amount per share paid in the Torchmark tender offer. The Torchmark tender offer is scheduled to expire at midnight on December 14, 1988.

Also on November 16, 1988, KCL formally retained Kidder Peabody as exclusive financial adviser to KCL with respect to the evaluation of, and the preparation of a response to, the unsolicited offer to purchase for cash all outstanding shares of common stock of the Company. KCL paid a $75,000 retainer. Kidder Peabody had prior dealings with KCL in 1985. In late August, 1988, Kidder Peabody advised KCL in connection with formulating a response to Torchmark's August proposal. A $75,000 fee was paid by KCL for this assistance. Kidder Peabody also provided guidance to KCL in October, 1988. However, no formal agreement between these entities existed until November 16, 1988.

On November 18, 1988, Torchmark delivered a letter to the KCL Board stating that Torchmark was prepared to negotiate in good faith to develop a transaction that would be supported by KCL shareholders, employees, customers, and other constituencies. Torchmark reiterated its intention to maintain KCL's headquarters in Kansas City. To aid in these negotiations, Torchmark requested that the Board make available, pursuant to confidentiality agreements, non-public information concerning KCL.

On November 21, 1988, KCL terminated its self-tender offer. A KCL director testified that this termination was appropriate in light of the plaintiffs' tender offer and the resulting market uncertainty. Also, on November 21, 1988, the Bixby defendants, among others, entered into a stockholders' agreement (the "Stockholders Agreement"), whereby each party agreed not to tender, sell, transfer, assign, encumber or otherwise dispose of his, her, or its shares of KCL stock until the earlier to occur of (i) 180 days following November 21, 1988, or (ii) the written agreement to terminate the Stockholders Agreement by parties to the Stockholders Agreement who own shares

that constitute not less than 66⅔% of the aggregate number of shares subject to the Stockholders Agreement. The Stockholders Agreement was disclosed to the SEC on November 23, 1988, in the form of a Schedule 13D filing.

On November 22, 1988, KCL filed a 13E–4 form to reflect their termination of the self-tender offer. Pursuant to SEC rules, as a result of the termination, neither defendants nor any of their affiliates could purchase shares of KCL stock until December 7, 1988.

On November 28, 1988, the Board, including all outside directors, considered plaintiffs' outstanding $43.50 offer for control of KCL. During the course of the day-long meeting, the board was given a detailed analysis by Kidder Peabody, and actuarial consultants. Also present at the meeting were counsel for KCL, and separate counsel for the independent directors and for Kidder Peabody. During the meeting, the outside directors requested that the four members of the Bixby family leave the meeting so that the independent directors could separately discuss plaintiffs' tender offer and ask questions of the management directors, legal counsel and Kidder Peabody. These non-Bixby directors asked questions regarding the duty of the directors in such situations and asked many other questions of management and the advisors. A verbal poll was taken of each director's position. Each member individually expressed his opinion that the Torchmark tender offer was inadequate. The non-Bixby directors who appeared before the Court testified that they were neither coerced nor unduly influenced by the Bixbys in arriving at this conclusion. The Bixby family members were invited back into the meeting. The entire Board then unanimously voted to reject the Torchmark offer.

The record establishes that plaintiffs' portrayal of the KCL Board as a puppet in the hands of the Bixby family is not accurate. Non–Bixby members of the Board sought advice and rendered decisions independently. These Board members were aware of possible conflicts of interest with respect to their duties as directors and questioned financial advisors and counsel about these duties after Bixby Board members had left the meeting. In an uncontroverted account, Ilus Davis testified that the Bixbys did not coerce or unduly influence the non-Bixby directors.

On the present record, the Court must also conclude that plaintiffs' portrayal of the activities by the Bixbys and the Board since 1986[4] as furthering a fraudulent scheme to entrench the Bixby family in control at the expense of the shareholders is likewise inaccurate.

On November 29, 1988, Torchmark announced that it was increasing the amount it would pay for all outstanding shares of KCL to $47.50. This offer is conditioned upon the Board of KCL granting Torchmark an option to purchase 1,827,985 authorized but unissued shares of KCL, representing approximately 25% of the currently outstanding shares, at $47.50 per share. The option would be exercisable only if approximately 73% of the shares held by the public are tendered. With this option, the minimum condition for tenders would be reduced from a majority to approximately 37.5% of the outstanding shares. This revised Torchmark tender offer expires on December 14, 1988. As of the date of the hearing, the KCL Board had not yet met to consider this new offer.

## II. DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLAIMS DUE TO LACK OF STANDING

### A. *Torchmark has no standing as a shareholder to assert breach of fiduciary duty claims.*

Fed.R.Civ.P. 23.1 requires that in derivative actions the plaintiff must fairly and adequately represent the interests of similarly situated shareholders. To satisfy this requirement, "the plaintiffs must not have interests antagonistic to those of their fellow shareholders." *Baron v. Straw-*

---

**4.** Whether plaintiffs have standing to challenge any activities prior to November 14, 1988 when plaintiffs became shareholders is discussed in Section II.

*bridge & Clothier*, 646 F.Supp. 690, 695 (E.D.Pa.1986) (citing *Lewis v. Curtis*, 671 F.2d 779, 778 (3d Cir.) *cert. denied* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982)). A defendant corporation challenging the adequacy of representation has the burden of demonstrating inadequacy. *Dawson v. Dawson*, 645 S.W.2d 120, 129 (Mo.Ct.App. 1982) (citing *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 592–93 n. 15 (5th Cir.), *cert. denied* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974)). Defendants have met their burden in the instant case.

■ In *Baron v. Strawbridge & Clothier*, the court held that a shareholder, who was also a tender offeror seeking to gain control of the target company, lacked standing under Rule 23.1 because its interests were antagonistic to those of the target company's shareholders. 646 F.Supp. at 695. The court considered factors that are pertinent in the present determination such as: "the economic antagonism between representatives and class;" "[t]he relative magnitude of plaintiffs' personal interests as compared to his interest in the derivative action itself;" and "[t]he degree of support plaintiff was receiving from the shareholders he purported to represent." *Id.* at 695. "Manifestly antagonistic" was the court's apt description of the situation where, as in the instant case, a shareholder-tender offeror hopes to acquire a company at the lowest possible price per share and the other shareholders hope to sell at the highest possible price per share.[5]

■ In addition to economic antagonism, this Court finds other factors to support its finding that Torchmark[6] is an inadequate

representative of KCL's shareholders. First, looking at this lawsuit as a whole, it is apparent that plaintiff's primary purpose in instigating this action is the acquisition of a controlling interest in KCL. Second, no other shareholders have joined plaintiff in this action. Although plaintiff correctly articulates a common interest in preserving the value of its investment and in preventing KCL Directors from breaching their fiduciary duties, plaintiff is not the proper representative of KCL's shareholders. Therefore, as Rule 23.1 explicitly requires that a plaintiff adequately and fairly represent the interests of all shareholders, and in light of the manifestly antagonistic relationship between plaintiff as tender-offeror and the other shareholders, plaintiff's derivative claims that defendants breached their fiduciary duties are dismissed.[7]

**B. *Torchmark, as a shareholder, lacks standing to assert causes of action under Sections 13 and 14 of the Exchange Act.***

■ Nor is Torchmark the proper representative of KCL's shareholders with regard to the equitable remedies plaintiff seeks to redress defendants' alleged violations of the Securities Exchange Act. Many cases have held that tender offerors who are also shareholders lack standing to pursue SEC violations derivatively. *See, e.g., Piper v. Chris–Craft, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977) (subsequent history omitted); *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 (6th Cir. 1981); *see also Luptak v. Central Cartage Co.*, [1981] Fed.Sec.L.Rep. (CCH) ¶ 98.034

---

5. Plaintiff attempts to distinguish this case by comparing the price of the KCL's tender offer to that of Torchmark and thus concluding since Torchmark's is higher, plaintiffs adequately represent the shareholders. As discussed in footnote 11, infra, this is not a relevant comparison.

6. Torchmark is the only plaintiff that owns KCL stock.

7. Torchmark also lacked standing to pursue many of its claims derivatively as it purchased its shares of stock on November 14, 1988 after many of the alleged breaches of fiduciary duties occurred. In some cases in some circumstances, courts permit maintenance of an action by parties who were not stockholders at the time

the alleged wrong occurred under a "continuing wrong" or "continued injury" theory. *See, e.g. Pullman–Peabody Co. v. Joy Manufacturing Co.*, 662 F.Supp. 32, 35 (D.N.J.1986); *Kaplan v. Rosset*, 355 Mo. 496, 196 S.W.2d 800, 809 (1946) (en banc). This Court, however, is persuaded that the more prudent rule in this situation is that of contemporaneous ownership. This furthers policy concerns preventing the purchasing of lawsuits and ensuring actions are maintained on behalf of injured shareholders. *Pullman–Peabody Co.*, 662 F.Supp. at 35–36; *see also Lewis v. Chiles*, 719 F.2d 1044, 1047 n. 1 (9th Cir.1983).

(E.D.Mich.1979) [1979 WL 1280]. In *Chris–Craft*, the Supreme Court recognized that a tender offeror, who was attempting to acquire the target company, and the target company shareholders' interests could be antithetical. Chief Justice Burger stated:

> As a tender offeror actively engaged in competing for Piper stock, Chris–Craft was not in the posture of a target shareholder confronted with the decision of whether to tender or retain its stock. Consequently, Chris–Craft could scarcely have alleged a need for the disclosures mandated by the Williams Act. In short, the fact that Chris–Craft necessarily acquired Piper stock as a means of taking over Piper adds nothing to its § 14(e) standing arguments.

430 U.S. at 35–36, 97 S.Ct. at 946–947. Torchmark purchased and is purchasing KCL stock as a means of acquiring control of KCL. Torchmark does not share the interest of an ordinary shareholder in trying to raise the price of KCL stock. Because Torchmark is a hostile tender-offeror, Torchmark may not assert its claims under the Williams Act derivatively.[8]

C. *Plaintiffs as Tender Offerors have standing to assert their claims.*

■ The remaining standing issues before this Court are whether plaintiffs as a tender offeror may maintain an action for an injunction.

In *Cowin v. Bresler*, 741 F.2d 410 (D.C. Cir.1984), the court held that a minority shareholder may bring individual claims for breach of fiduciary duty where the directors' conduct has caused him special, discrete injury. *Id.* at 415. *See also Moran v. Household Intern, Inc.*, 490 A.2d 1059 (Del.Ch.), *aff'd* 500 A.2d 1346 (Del. 1985).[9]

Plaintiffs, as tender-offerors, do have standing "to challenge the actions of the target management exercised in the course of defending against the offer." *Crouse–Hinds Co. v. Internorth, Inc.*, 518 F.Supp. 390, 403 (N.D.N.Y.) *appeal on this ground dismissed*, 634 F.2d 690, 692 n. 1 (2d Cir. 1980) (citations omitted). Plaintiffs have standing to bring a claim "as a potential acquiror in an effort to assist their tender offer." *Tate & Lyle PLC v. Staley Continental, Inc.*, [1987–88] Fed.Sec.L.Rep. (CCH) ¶ 93,764 at 98,586 (Del.Ch.1988) [1988 WL 46064] (citing *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.* (Del. Ch. CA No. 8126, Oct. 9, 1985)); *See also CRTF Corp. v. Federated Department Stores, Inc.*, 683 F.Supp. 422 (S.D.N.Y. 1988) (tender offeror had standing to challenge a target company's "poison pill"). In accordance with these decisions, this Court holds that plaintiffs have standing to challenge the actions of KCL's management taken in response to Torchmark's offer.

■ The final issue regarding plaintiffs' standing before this Court is whether a tender offeror has standing to seek an injunction for violations of the Williams Act. In *Chris–Craft*, the Supreme Court held that a tender offeror did not have a private cause of action for damages against a successful, competing bidder and the target company under Section 14(e) of the Securities Exchange Act. In coming to this conclusion, the Supreme Court examined the purpose of section 14 and other provisions of the Williams Act; and concluded, the Act was intended to benefit shareholders, not entities attempting to acquire the target company. *Chris–Craft*, 430 U.S. at 35–36, 97 S.Ct. at 946–947.

However, the Supreme Court refrained from deciding the question of whether a tender offeror has standing in an equitable action based on alleged violations of either § 14(e) or Rule 10b–5. *Id.* at 47 n. 33, 97 S.Ct. at 952 n. 33. Several federal courts have recognized tender offerors have standing in their quests for equitable relief. *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d

---

8. United Investors Management Co. owns no shares of KCL stock and, therefore, has no standing to assert any derivative claims against KCL.

9. In *Moran*, the court held that since plaintiff's minority shareholders were *not* engaged in a proxy battle, they suffered no injury distinct from that suffered by other shareholders as a result of management's activities. *Id.* at 1070.

366, 372 (6th Cir.1981); *McFadden Holdings, Inc. v. J.B. Acquisition Corp.*, 641 F.Supp. 454 (S.D.N.Y.1986); *Whittaker Corp. v. Brunswick Corp.*, 535 F.Supp. 933 (N.D.Ill.1982); *Weeks Dredging & Contracting, Inc. v. American Dredging Co.*, 451 F.Supp. 468 (E.D.Pa.1978); *Humana, Inc. v. American Medicorp, Inc.*, 445 F.Supp. 613 (S.D.N.Y.1977).

Three tenets are relied on by these courts in reaching the conclusion that tender offerors have standing to seek injunctive relief under the Williams Act. First, in corporate control contests, injunctive relief at an early stage is "apt to be the most efficacious form of remedy." *Chris–Craft*, 430 U.S. at 40 n. 26, 97 S.Ct. at 948 n. 26. Second, tender offerors are more likely to be in a position to discover violations of the Act than other shareholders. *See, e.g., Mobil Corp.*, 669 F.2d at 371. Finally, if the plaintiffs' allegations are proven, the target company's shareholders benefit when the requested relief is granted. *Humana*, 445 F.Supp. at 616. This Court concludes that the purpose of the Williams Act is furthered—by ensuring shareholders have the opportunity to make an informed decision as to whether to tender their shares—by a grant of injunctive relief if a target company's management violates the disclosure requirements of the Act. Therefore, this Court holds that plaintiffs, as tender offerors, do have standing to seek injunctive relief in this action.

### III. APPLICABLE LEGAL STANDARDS AND THE PLAINTIFFS' CONTENTIONS

In an *en banc* decision, the Eighth Circuit adopted the following standard for assessing the propriety of preliminary injunctive relief:

In sum, whether preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability of success on the merits; and (4) the public interest.

*Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (en banc).

The Eighth Circuit cautions against the "wooden application of the probability test". *Id.* at 113. Rather, a court is instructed to determine if "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.*

Plaintiffs argue that this Court should intervene in order to "restore 'due process' to this takeover battle." Plaintiffs request this Court to: (1) preliminarily enjoin defendants from further purchases of KCL shares; (2) require the KCL Board to constitute an independent committee of directors (advised by independent financial advisors) to review and report upon Torchmark's pending $47.50 tender offer for all KCL's shares; and (3) require KCL Board to negotiate in good faith with Torchmark.

First, plaintiffs contend that this relief is appropriate because KCL directors have breached their fiduciary duties by refusing to give due consideration to Torchmark's offers. Plaintiffs argue that in reacting to Torchmark's August proposal, tendering its November self-tender offer, and responding to Torchmark's original and amended self-tender offer, KCL has taken unreasonable, unresponsive and disproportionate measures in relation to the hostile takeover attempt by Torchmark. Plaintiffs argue that these measures violate KCL Directors' fiduciary duties under *Unocal v. Mesa Petroleum*, 493 A.2d 946 (Del.1985). Plaintiffs also argue that KCL's self-tender offer constituted a transaction designed to shift control of KCL. Plaintiffs contend that this act was in violation of KCL's fiduciary duties under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986), because control of the Company was being transferred to management without efforts by the Directors to obtain the best price for the Company's public shareholders.

Second, plaintiffs contend that the relief requested is appropriate as defendants have violated the Williams Act. Plaintiffs

argue that the August 31 "Statements of Intention" evidence the existence of "group." Thus, the failure of this "group" to file a Schedule 13D form violated SEC Rule 13d–5(b)(1), 17 C.F.R. § 240.13d–5(b)(1) (1987). Plaintiffs also describe defendants' rejection (embodied in a Schedule 14D–9 filed by defendants pursuant to the mandates of § 14(d)(4)) of Torchmark's November 16 formal offer violates SEA requirements as it was false and misleading. Plaintiffs argue another violation of SEC Rule 13d–5(b)(1) occurred when defendants filed a Schedule 13D form on November 23, 1988 after certain defendants executed the "Shareholders Agreement." Plaintiffs claim that this agreement was entered into for an improper purpose—consolidation of Bixby control—and that this purpose was not disclosed in the Schedule 13D which these defendants filed. Finally, plaintiffs contend that KCL Board had not met "promptly" to consider Torchmark's November 29, 1988 amended offer in violation of SEC Rule 14d–9(b), 17 C.F.R. § 240.14d–9(b) (1987).

For reasons now discussed, the Court concludes that the plaintiffs have not shown a reasonable probability that they will succeed at trial on either claim. Plaintiffs have not demonstrated that the balance of equities so favors Torchmark that justice requires this Court's intervention to preserve the status quo until the merits are determined. Nor have plaintiffs established the irreparable nature of harm which they may suffer as to some of their claims.

## IV. PROBABLE SUCCESS ON THE MERITS

A. *The Board has not been shown to have acted in fraud, bad faith or self-interest.*

As set forth in the factual findings, the evidence in this case does not support the inference insinuated by the plaintiffs that KCL Board's recent activities were motivated by a purpose to entrench management control at the expense of shareholder interests. The record does not support a conclusion that from 1986 until present, the KCL Board acted in a covert, self-interested manner in violation of its fiduciary duties.[10]

At the inception of the complained-of activity, the KCL Board proposed amendments to KCL's Articles of Incorporation and By-Laws to the shareholders. It was disclosed to the shareholders that these amendments might have the effect of deterring an unsolicited proposal to acquire KCL. Furthermore, these amendments were proposed by an independent committee which for nine months had reviewed various strategies available to KCL to protect KCL shareholders from takeover attempts. The amendments were presented to the shareholders at a special meeting. A full proxy statement distributed to all shareholders disclosed that the proposed amendments may have the effect of giving the Bixby family more power over the Company's activities and, therefore, reducing the chance of success of any takeover bid opposed by the Bixby family. The shareholders approved these amendments.

In 1987, the Board authorized the Company's repurchase of shares of its common stock. The Board believed the repurchase program was a sound investment of the Company's funds. No purchases were made under this program after Torchmark contacted W.E. Bixby on August 26, 1988.

And, finally, on November 1, 1988, the Board instituted its self-tender offer. There was no offer outstanding from Torchmark at this time. In this offer, there was explicit language describing the effect consummation of the offer would have on Bixby shareholdings. The offer contained three prominently placed disclosures encouraging the individual shareholder to independently assess the value of the offer. It was also disclosed—even though not naming Torchmark particularly—that third parties were interested in acquiring the Company and that "maximum prices" in excess of the Company's own offer had

---

**10.** As discussed in Section II, this Court determined that plaintiffs do not have standing as a shareholder to pursue these claims. In any event, they would not be entitled to injunctive relief for the reasons discussed in this section.

been made.[11] This tender offer was not a fraudulent, misleading nor covert attempt to entrench the Bixby family.

In addition to these delineated activities, the Board met numerous times since Torchmark's initial expression of interest in KCL. Some directors spoke to or met with Kidder Peabody analysts. Presentations to the Board were made regarding Torchmark's late August proposal and KCL's tender offer, among other business.

Plaintiffs also contend that defendants inappropriately rejected plaintiff's takeover proposal of August 25, 1988 and plaintiffs' tender offer of November 16, 1988.[12] Plaintiffs allege that their August 29, 1988 offer to purchase all outstanding shares of KCL for $42.50 per share was summarily rejected without invitation to plaintiffs to enter into discussions with defendants. Plaintiffs also argue that the statements of intention were signed upon the urging of the Directors and involved "group" activity. KCL Board's rejection of Torchmark's November 16, 1988 tender offer is also said to be a breach of the Board's fiduciary duties.

In determining whether Torchmark has a probability of success on the merits, this Court will evaluate the KCL Directors' conduct prior to November 16, 1988, in accordance with the "business judgment rule." Under this rule, the Directors are presumed to have exercised their business judgment with due care and good faith and in the honest belief that they were acting in the best interest of the corporation. *Jackson v. St. Regis Apartments, Inc.,* 565 S.W.2d 178, 183 (Mo.Ct.App.1978). In order for a court to interpose its authority "there must be actual or threatened acts

which are ultra vires, fraudulent and are injurious, and are an abusive [sic] power, and are acts of oppression on the part of the corporation or its officers." *Id.*

The business judgment rule may be applicable in the context of a takeover. *Robert M. Bass Group, Inc. v. Evans,* 552 A.2d 1227 [Current] Fed.Sec.L.Rep. (CCH) ¶ 93,924 at 90,196 (Del.Ch.1988). "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be 'attributed to any rational business purpose.'" *Unocal,* 493 A.2d at 954, (quoting *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971)). However, in *Unocal,* the Delaware Supreme Court recognized a Board's inherent conflict of interest when a corporation is acting in apprehension of a hostile attempt to acquire control of the corporation. *Id.* at 956. In this situation, the Court articulated an enhanced duty standard to be applied before a board's action will be afforded protection of the business judgment rule.[13]

Under the *Unocal* two-part standard, in order for the actions of a target company's board to be upheld, the directors must establish that they had "reasonable grounds for believing that a danger to corporate policy and effectiveness existed.... [T]hey satisfy that burden by showing good faith and reasonable investigation." *Unocal,* 493 A.2d at 955. Before a defensive measure is assessed under the business judgment rule, it also "must be reasonable in relation to the threat posed." *Id.*

The actions of the KCL Board which plaintiffs contend are in violation of the Directors' fiduciary duties were not taken

---

**11.** Plaintiffs assert that because their tender offer was at a higher price than KCL's tender offer ($42.50 compared to a $30.00–$34.00 "dutch auction"), defendants breached their fiduciary duty. However, acquiring a controlling interest generally commands a price more dear than that necessary to purchase a minority interest. *See Smith v. Van Gorkum,* 488 A.2d 858, 876 (Del.1985).

**12.** Based on this Court's determination that Torchmark has standing as a potential acquiring entity—and there is insufficient proof of an ongoing plan to entrench management in violation

of KCL's fiduciary duties—these two alleged acts of wrongdoing are the crux of plaintiffs' breach of duty claim.

**13.** An even stricter standard for determining the propriety of directors' actions apply when directors act in their own self-interest. In such a case, the Board must establish the complained-of transaction is entirely fair. *AC Acquisitions Corp. v. Anderson,* 519 A.2d 103, 111 (Del.Ch. 1986). In addition, this Court finds *Revlon* inapplicable as the Company was not "in play."

in apprehension of a challenged takeover. Defendants' stock repurchase plan authorized in 1987 and defendants' 1986 shareholder approved amendments to KCL's Articles of Incorporation and By-Laws were prophylactic measures. Defendants' November 1, 1988 tender-offer was a continuation of this two-year-old shareholder-approved policy to make KCL a less vulnerable target for a takeover. None of these actions were taken in direct response to a firm, hostile offer by Torchmark.[14] Thus, these actions by the Board will be afforded protection of the business judgment rule.

Defendants have not demonstrated a likelihood of success on the merits with regard to their claim that KCL's Directors breached their fiduciary duties. There is no evidence of fraud. There is no evidence that the Directors were engaged in self-dealing or made decisions regarding transactions from which the Directors benefitted to the exclusion of the corporation and its shareholders. As the Delaware Supreme Court stated in *Unocal*, "in the broad context of corporate governance, including issues of fundamental corporate change, a board of directors is not a passive instrumentality." [15] 493 A.2d at 954.

■ Plaintiffs have not borne their burden of showing the reasonable probability that either (1) the measures taken by defendants to make KCL a less vulnerable target for takeovers [16], or (2) KCL Board's consideration of Torchmark's proposal and formal offer of August 29, 1988 and November 16, 1988, were violative of defendants' fiduciary duties. A corporation's board of directors may reject a takeover proposal without: (1) negotiating with the bidder when the rejection is made in the proper exercise of in informed business judgment; and (2) hiring outside invest-

ment advisors to render a decision on the adequacy or fairness of the takeover proposal. *Lewis v. Honeywell* [1987–88] Fed. Sec.L.Rep. (CCH) ¶ 93,565 at 97,534 (Del. Ch.1987) [1987 WL 14747]; *Smith v. Van Gorkum*, 488 A.2d 858, 876 (Del.1985).

■ As the Delaware Supreme Court noted in *Van Gorkum*, insiders are frequently in a better position to assess the intrinsic value of the corporation's shares. *Id.* Defendants had no duty to accept an undesirable offer even if it contained a substantial premium over the then-prevailing market rate. *Id.* at 881. Furthermore, in *Tate & Lyle PLC v. Staley*, a Delaware Chancery Court did not enjoin anti-takeover measures taken by a board when unanimous approval of outside directors was obtained before the full board approved the measure. [1987–88] Fed.Sec.L.Rep. ¶ 93,764 at 98,565.

■ In each Board consideration of Torchmark's offers, the Directors were informed and were not grossly negligent. The August 31 rejection of Torchmark's offer was made after an appraisal of its adequacy by the Directors and was voted on in light of the perceived infeasibility of the proposed acquisition due to the signed statements of intention. The rejection of Torchmark's November 16, 1988 offer was made after a full day of discussion among the entire Board. During this meeting the Board received the advice of investment bankers as to the adequacy of the offer. In addition, KCL's independent Directors discussed their fiduciary duties, assessed the offer, and unanimously rejected the offer in a meeting without the Bixby family members. Upon the return of the Bixby Directors, the entire Board rejected this offer.

---

14. On August 31, 1988, defendants responded negatively to Torchmark's original proposal (dated August 29, 1988). Defendants' tender offer of November 1, 1988 was made two months later. In the interim, no further proposals or formal offers were advanced by plaintiffs.

15. In *Unocal*, the court describes a "host of defensive measures" that have been developed and implemented to counter hostile threats.

These devices including defensive charter amendments, have received judicial sanction. 493 A.2d at 957.

16. Plaintiffs have no standing to challenge these activities by the Board in a derivative capacity. Plaintiffs do not by virtue of their standing as "bidders" have standing to challenge any action by the Board prior to August 29, 1986.

Plaintiffs have not demonstrated a probability that any of these acts fall outside the broad spectrum of deference which the Court would afford KCL in a trial on the merits. Torchmark has not demonstrated that in balancing the equities, the scales tip in its favor. Justice does not compel this Court's intervention in the market place. Plaintiffs have not shown this Court any reason it should force KCL to retain other investment advisors. Enjoining KCL or the individual defendants from purchasing KCL stock would not "level the playing field;" rather, the requested injunction would tilt the field in plaintiffs' favor.

B. *Defendants have fully complied with all Federal Securities Disclosure Requirements.*

Plaintiffs contend that in addition to breaching their fiduciary responsibilities, defendants have violated Sections 13(d), 14(d) and 14(e) of the Exchange Act. Yet plaintiffs have not borne their burden of establishing a probability of success on the merits as to these claims. For the reasons stated in this section, plaintiffs' request for preliminary injunctive relief on these grounds is denied.

1. *Defendants' alleged violation of § 13(d).*

■ Section 13(d) of the Exchange Act provides:

Any person who, after acquiring ... beneficial ownership of any equity security ... is directly or indirectly the beneficial owner of more than 5 percentum of such class shall, within ten days after such acquisition, send to the issuer ..., sent to each exchange where the security is traded, and file with the [SEC], a [Schedule 13D] statement containing [certain information].

15 U.S.C. § 78m(d)(1) (1981). Section 13(d)(3) defines "person" to include "two or more persons acting as a partnership, limited partnership, syndicate, or other group

for the purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78m(d)(3) (1981). Plaintiffs allege that defendants have not complied with Section 13(d). Plaintiffs equate the signing—by some KCL shareholders of "Statements of Intention" not to tender their shares—with the formation of a group as defined by SEC Rule 13d–5(b)(1). 17 C.F. R. § 13d–5(b)(1) (1987). A "group" exists when there is an agreement to act in concert with respect to purchasing, voting, disposing or holding of shares. *See Mid–Continent Bancshares v. O'Brien* [1982] Fed. Sec.L.Rep. (CCH) ¶ 98,734 (E.D.Mo.1981) [1981 WL 1404]. "While an agreement to act in concert need not be in writing or in any other way formalized, there must be evidence that indicated an intention to act in concert over and above the prior and continuing relationships between the various parties." *K–N Energy, Inc. v. Gulf Interstate Co.,* 607 F.Supp. 756, 765 (D.C. Colo.1983) (citations omitted); *see also Bayly Corp. v. Marantette* [1982] Fed.Sec. L.Rep. (CCH) ¶ 98,834 (D.D.C.1982) [1982 WL 1337].

■ The evidence presented to this Court establishes that none of the defendants were acting in concert when each individually and separately signed a Statement of Intention.[17] The mere fact that defendants were related through blood, marriage, business or social relationships is insufficient to warrant the finding that a "group" existed within the definition of § 13(d) of the Act. There is no evidence proving any defendants entered into any expressed or implied agreement with respect to the disposition of their stock prior to the November 21, 1988 Stockholders' Agreement.

■ Plaintiffs next contend that the Schedule 13D filed on November 23, 1988 by the Bixby shareholders and others—after the formation of the Stockholders'

---

**17.** These "Statements of Intention" are identical in form. Testimony revealed that these forms were generated and distributed as part of an inquiry to certain shareholders, including members of the Bixby family. This inquiry was initiated in order to ascertain the feasibility of Torchmark's August proposal. No evidence of coercion or domination by the Bixbys, or cooperation among the signatories in the submission of these signed statements, has been presented to the Court.

Agreement—is materially false and misleading. Plaintiffs claim the Schedule 13D fails to disclose: 1). the existence of a "group" prior to November 21, 1988; 2). the purpose plaintiffs feel was the motivation behind the creation of this agreement; and 3). the purported intention of the Bixbys and/or KCL to entrench Bixby control.

In evaluating the adequacy of a Schedule 13D, a court should determine. if the form is fairly accurate; perfection is not required. *See TWA v. Icahn,* 609 F.Supp. 825, 831–32 (S.D.N.Y.1985); *Purolater, Inc. v. Tiger Int'l, Inc.,* 510 F.Supp. 554, 556 (D.D.C.1981). First, as just discussed, there is *no* evidence establishing the formation of a "13d group" prior to November 21, 1988. In addition, neither the testimony nor the demeanor of the witnesses demonstrates the existence of any "purpose" behind the Stockholders' Agreement contrary to that disclosed in the 13D form.[18] Nor does any evidence before this Court indicate that the shareholders who signed the Agreement have any plans or proposals to purchase KCL stock.

Based on the evidence presented to this Court, plaintiffs have not borne their burden of showing a probability of success on the merits as to any claim Section 13(d) was violated.

**2. *Defendants' alleged violation of §§ 14(d) and (e).***

Section 14(e) of the Exchange Act provides:

It shall be unlawful for any person to make any untrue statement of material fact or omit to state any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not mis-

leading, or to engage in any fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer. . . .

15 U.S.C. § 78n(e) (1981).

Section 14(d)(4) of the Exchange Act provides:

Any solicitation or recommendation to the holders of . . . a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78n(d)(4) (1981).

For purposes of the Exchange Act, facts are "material if there is a substantial liklihood that a reasonable investor would consider them important or significant in making an investment decision." *Koppers Co., Inc. v. American Express Co.,* 689 F.Supp. 1371, 1384 (W.D.Pa.1988) (citing *Berg v. First American Bancshares, Inc.,* 796 F.2d 489, 495 (D.C.Cir.1986)). To prove materiality, plaintiffs must show that under all the circumstances the omitted fact would have assumed "actual significance in the deliberations of the reasonable shareholder." *Id.* (citations omitted).

Plaintiffs allege that the Schedule 14D–9 filed by KCL in order to reflect their response to plaintiffs' offer misled the public. The Schedule 14D–9 is allegedly false and misleading because it fails to disclose, among other things, that the decision to reject plaintiffs' tender offer was made by interested directors. However, the Schedule 14D–9 suggests that this rejection was made by a majority of directors after extensive consideration of plaintiffs' offer.[19]

---

**18.** The purpose of the transaction as appears on the Schedule 13D filed with the SEC reads as follows:

"The members of the Bixby Group, who are members of one family or are related trusts, have independently determined that, at the present time, they each believe it is in their best interest to maintain their present ownership interest in the Company. Accordingly, the Bixby Group has entered into the Stockholders Agreement . . . for the purposes of assuring that members of the Group will act uniformly with respect to the shares of Com-

mon Stock owned by such members, including with respect to the November 16, 1988 offer to purchase (the "offer") all outstanding shares of the Common Stock of the Company by United Investors Management Company . . ." Schedule 13D, Item 4, page 14–15.

**19.** KCL disclosed in its Schedule 14D–9 that the Board considered the value of the Company, the opinion of the Company's financial advisors and Kidder Peabody as to the financial adequacy of the offer, the viability of the offer in light of stockholders' agreement, the conditional nature

This Court finds that the 14D–9 filing by defendants fairly reflects what transpired. The existence of the "Statements of Intention" signed by several large shareholders is relevant as to the feasibility of the August Torchmark proposal. The existence of these statements did not preclude a fair assessment by the Board of the plaintiffs' November 16, 1988 offer. In addition, as disclosed in the Schedule 14D–9, the Board held day-long deliberations before rejecting plaintiffs' offer. Testimony established that there was no coercion or domination by the Bixby family Board members. Independent directors met with both financial and legal advisors outside the Bixby family members' presence. (See discussion in Section IV.)

In conclusion, the plaintiffs have not established at this preliminary stage, the probability of success on the merits or irreparable harm will result as to plaintiffs' claims defendants violated §§ 14(d) and (e). The 14D–9 filing adequately disclosed the plaintiffs' offer, defendants' deliberations in response and defendants' basis for rejecting this offer. As to the Statements of Intention, the alleged impropriety of their nondisclosure is no longer pertinent as the Stockholders' Agreement and its disclosure notified all shareholders of the decision by the signatories of the Agreement that they would not tender their shares.

■ And, as to plaintiffs' final contention that defendants have not responded with adequate haste to the November 29, 1988 Amendment by plaintiffs to their tender offer, this Court finds this argument is without merit. The SEC rules do require that the KCL Board must meet promptly to disseminate its position on the amended plaintiffs' offer. *See* SEC Rule 14d–9(b); 17 C.F.R. § 240.14d–9(b) (1979). The terms of the Amended Offer have been promptly disclosed by KCL. Yet nothing

in this provision mandates a decision on the Amended Offer by December 5, 1988; it requires prompt disclosure of the Board's decision once the Board determines how it will respond.

Torchmark complains that any decision made after December 5—just six days after its new Offer—is "further evidence of [KCL]'s disregard for the requirements of the federal securities laws." Yet this is hardly an accurate portrayal of the actual situation. First, federal securities law requires that companies respond to *initial* tender offers no later than 10 days from the date it is published or sent or given. *See* SEC Rule 14e–2d; 17 C.F.R. § 240.14e–2 (1979). There is no such express requirement governing responses to amendments of these offers other than the "prompt" disclosure language of Rule 14d–9(b).[20]

Defendants apprise the Court that they intend to meet on Wednesday, December 7, 1988, after the termination of this hearing. Indeed, it is prudent planning by KCL Board to hold a meeting at this date in order that it may consider this Amended Offer in light of this Court's ruling. Plaintiffs, defendants and this Court have spent their energy in these last few days on preparation for this hearing. Plaintiffs cannot file this type of action demanding a speedy resolution of complex issues in a short period of time, amend their offer and demand that defendants respond before they have had the opportunity to adequately assess the propriety of the Amended Offer. Indeed, the existence of this action before the Court has distracted defendants from their ability to concentrate their resources on assessing plaintiffs' latest amended offer. This Court finds that KCL's Board had no duty to respond to plaintiffs' Amended Tender Offer by Monday, December 5, 1988.

of the offer, and the potential social, legal and economic effects of the offer on policyowners, employees and the community. Schedule 14D–9, Item 4, p. 4–5.

**20.** A letter dated December 5, 1988 from the SEC has been submitted to this Court. It is the informal opinion by an SEC attorney that "a

delay of seven business days before responding to this [amended offer] is not considered to be the prompt response contemplated by the rules." This attorney was not apprised of all the facts of this case—including the existence of this litigation and this hearing—when he rendered this opinion.

**1086**

## V.  CONCLUSION

Plaintiffs have not demonstrated a likelihood of success on the merits as to any of their claims.  In addition, plaintiffs have not shown they will suffer irreparable harm as to the claim that defendants violated Section 13(d) of the Securities Exchange Act.  Upon balancing the equities, the relief plaintiffs seek in their quest to acquire a controlling interest in Kansas City Life Insurance Company is not warranted.  Justice precludes this Court's intervention in the market place under the circumstances of this case.  It is not judicious for this Court to interfere with KCL's management in their consideration of Torchmark's Amended Offer.

It is, therefore,

ORDERED that plaintiffs' motion that this Court enjoin defendants from purchasing Kansas City Life shares pending trial on the merits or further order of this Court is denied.  It is further

ORDERED that plaintiffs' motion that this Court require the Kansas City Life Board to appoint a special committee to consider Torchmark's Amended Offer is denied.

It is further

ORDERED that plaintiffs' motion that this Court require defendants to negotiate in good faith with Torchmark and provide Torchmark with non-public information is denied.